**Certiorari Granted, May 17, 2011, No. 32,968**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-049**

**Filing Date: March 24, 2011**

**Docket No. 28,807**

**SUNNYLAND FARMS, INC.,**

   **Plaintiff-Appellee,**

**v.**

**CENTRAL NEW MEXICO**
**ELECTRIC COOPERATIVE, INC.,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**John W. Pope, District Judge**

Freedman Boyd Hollander Goldberg Ives & Duncan, P.A.
Joseph Goldberg
Michael Goldberg
Albuquerque, NM

Walter K. Martinez Law Office
Kenneth Martinez
Kevin Martinez
Albuquerque, NM

for Appellee

Cuddy & McCarthy, LLP
Gregory V. Pelton
Albuquerque, NM
Montgomery & Andrews, P.A.
Stephen S. Hamilton
Jaime R. Kennedy
Santa Fe, NM

1

for Appellant

Virtue Najjar & Brown, PC
Lucy E. Bettis
Santa Fe, NM

for Amicus Curiae N.M. Rural Electric Coop. Ass'n

Michael B. Browde
Albuquerque, NM

for Amicus Curiae N.M. Trial Lawyers Ass'n

**OPINION**

**SUTIN, Judge.**

**{1}** Defendant Central New Mexico Electric Cooperative, Inc. appeals a judgment awarding substantial consequential and punitive damages to Plaintiff Sunnyland Farms, Inc. Plaintiff purchased a commercial greenhouse operation intending to hydrophonically grow tomatoes. Its facilities were destroyed by fire before it was able to plant its first crop. Plaintiff sued Defendant on various theories including claims for breach of contract and negligence in failing to provide the required advance notice before disconnecting electric power to Plaintiff's facilities, and claiming that, as a result of the disconnect, Plaintiff could not access water necessary to quench the fire.

**{2}** The district court determined that Plaintiff suffered approximately $21 million in consequential damages. The court compared fault on the negligence claim and determined that Plaintiff was 80% at fault and Defendant was 20% at fault. The court did not consider Plaintiff's fault on the breach of contract claim and awarded Plaintiff the full amount of damages, and permitted Plaintiff to elect its remedy after the time for appeal had expired. On appeal, Defendant attacks the allowance of consequential damages in contract, the award of punitive damages, and the amount of the consequential damages attributable to future lost profits. Plaintiff cross-appeals on issues involving prejudgment and post-judgment interest and a set-off. We hold that the district court erred in awarding consequential damages in contract and in awarding punitive damages. On the issue of the amount of the lost profits awarded on Plaintiff's negligence claim, we hold that Plaintiff's evidence lacked a reasonably certain basis as to future production levels on which the court based its award and therefore did not support the amount of the award. On the cross-appeal issues, we hold that the court did not err, and we affirm on those issues.

**BACKGROUND**

**The Start of the Relationship**

2

**{3}** Defendant is an electric cooperative that was owned and operated by its members who purchase and distribute electricity to themselves for their own benefit. Defendant and its members are bound by Defendant's bylaws, rules, rate classifications, and rate schedules, including tariffs filed by Defendant with the New Mexico Public Regulatory Commission (PRC) (formerly the Public Utility Commission).

**{4}** One tariff, or "original rule," states that if payment by a member using electricity is not paid within fifteen days from the date of a delinquent disconnect notice from Defendant, the member "will be subject to disconnect." A PRC regulation to which Defendant was subject states that a cooperative can disconnect electricity for failure of a member "to fulfill his contractual obligations for services," but that it "shall not constitute sufficient cause for discontinuing service to an existing [or] . . . prospective customer . . . for failure to pay the bill of another customer as guarantor thereof."

**{5}** In June 2003 Plaintiff purchased a tomato farm from Agstar of New Mexico, Inc. (Agstar), agreed to pay Agstar's debts, and told Defendant that Plaintiff would assume liability for Agstar's delinquent obligations to Defendant. Electricity to the facilities had been turned off by Defendant for Agstar's nonpayment. On July 10, 2003, Plaintiff opened four accounts in Plaintiff's name and paid Defendant a deposit of $10,750. Plaintiff also paid all amounts owed to Defendant by Agstar as of July 10, Agstar's four accounts with Defendant were closed, Agstar was no longer using electricity, and Agstar's existing deposit was added to Sunnyland's deposit. Plaintiff received Defendant's final bills for Agstar's electricity accounts which were mailed by Defendant on July 17, 2003. These bills stated that they would become delinquent on August 5, 2003.

### The Disconnect Notices and Ultimate Disconnect of Plaintiff's Electricity

**{6}** A saga followed of Defendant's mixture of mistaken, ambiguous, and inappropriate billings and disconnect notices and procedures, which were the bases for the district court's determinations of Defendant's contract and tort liability in this case. That unfortunate saga was followed by Plaintiff's negligent actions and failures to act, which were the bases for the court's determinations of Plaintiff's comparative fault.

**{7}** Defendant's first billing to Plaintiff on August 9, 2003, to September 8, 2003, when Defendant disconnected electricity to one of Plaintiff's accounts, was replete with mistaken, confusing, and improper billings, and with improper electricity cut-off procedures and orders and disconnect notices that we need not detail. Plaintiff was not aware that Defendant had sent an employee to Plaintiff's operation on September 8, 2003, to disconnect the electricity. Once Plaintiff became aware on September 8 that its electricity had been disconnected to the tomato-growing facility, an employee of Plaintiff called Defendant to determine why the electricity had been disconnected and was told that all four of Agstar's accounts were four months past due, although Agstar's past due accounts had been paid up as of July 10, 2003. Plaintiff's employee was also told that, as a requirement of reconnect, Plaintiff had to pay all amounts owed including Plaintiff's most recent bills, that is, bills that were mailed out

just two days before the date of the disconnect, and that Plaintiff also had to pay a reconnect fee for all four accounts.

{8} Plaintiff sent payment to Defendant via overnight mail on September 8, 2003, after conversing with Defendant as to why the electricity had been disconnected. The district court found that Plaintiff did not pay the amounts billed until 11:13 a.m. on September 9, 2003, which was when Defendant received Plaintiff's payment for the August 9, 2003, bills. In that regard, the district court also found that Plaintiff "failed to take any reasonable efforts to make payment to [Defendant] on September 8, 2003." The district court further found that Defendant admitted that it disconnected the electricity for non-payment of Agstar's bills that were, in Defendant's view, guaranteed by Plaintiff, and that Defendant did not disconnect the electricity to Plaintiff's operation for any amounts owed by Plaintiff for its electrical use.

**The Unfortunate Aftermath**

{9} Sometime between 9:30 and 9:45 on the morning of September 9, 2003, Plaintiff's employees were welding a trailer hitch inside the packing facility. The welding was being conducted near combustible materials which eventually started the fire. One of Defendant's employees was near the facility and drove over to see what was happening. The disconnect had caused one source of water to be unavailable to fight the fire. Although he had tools and the ability to reconnect the electricity, he did not do so. At about 11:07 a.m., Defendant was asked to turn the power back on. Shortly thereafter, additional employees of Defendant arrived at the scene. They questioned the request to turn the power back on because of safety concerns for the firefighters and said they would do so if someone agreed to accept liability for any injuries that might occur (a circumstance we discuss in more detail in our discussion of punitive damages later in the opinion). At approximately 11:15 a.m., firefighting efforts were suspended because of concerns about hazardous materials exploding. After materials exploded at approximately 11:25 a.m., firefighting efforts resumed at about 11:45 a.m. The fire ultimately consumed almost all of the facilities except for the greenhouse which was rendered useless without the operations building.

**The District Court's Findings of Fact, Conclusions of Law, and Judgment**

{10} The district court entered 248 findings of fact and entered 13 conclusions of law and a judgment. The findings detailed Defendant's billing notices and activities. The findings also set out with specificity the manner in which Plaintiff's employees and Plaintiff negligently acted and failed to act. The court specifically found that "[Plaintiff's] employees negligently caused the fire" and that their negligence was the "sole proximate cause of the fire." The court also found that Plaintiff was negligent per se in several respects, including the violations of various regulations by failing to train its employees in firefighting techniques, failing to have an emergency plan addressing what to do in case of a fire, failing to have a functioning and closable fire door between the packing house and a support building, and failing to comply with regulations concerning the use of a well pump. Further, the court found Plaintiff to be negligent by failing to properly maintain a dry hydrant that could have been used by the nearby town's fire department and that would have been the

4

best source of water to fight the fire, and also by failing to have more than one source of power which ran through a support building to energize an exterior well pump. In addition, Plaintiff's backup generator to provide electricity was not operating at the time of the fire. The court also entered numerous findings related to damages. Finally, in regard to Defendant's liability, the district court entered a finding that "the damages suffered by Plaintiff were foreseeable and a proximate cause of Defendant's [b]reach of [c]ontract, negligence[,] and negligence per se."

{11}   The following nine conclusions of law of the court are pertinent to the issues on appeal.

1.      The breach of contract by [Defendant] in failing to provide advance notice of the disconnect of electrical service to [Plaintiff] was the cause of contractual damages claimed by [Plaintiff].

        . . . .

5.      [Defendant] did [not][1] act maliciously, willfully, recklessly, wantonly, fraudulently, or in bad faith toward [Plaintiff], thereby barring its claims for punitive damages.

        . . . .

7.      This [c]ourt further finds that the conduct of Defendant . . . was [willful], reckless, wanton[,] and in bad faith entitling Plaintiff to punitive damages when it threatened [the fire chief] with "liability" twice before turning on the power to the facility after [the fire chief] requested the assistance of [Defendant] to reenergize the facility to allow the firefighters access to more water to fight the fire.

8.      $100,000.00 punitive damages are assessed against [Defendant] for impeding the firefighters with the threat of liability if the electricity was energized.

9.      A contract existed between [Defendant] and [Plaintiff]. The terms of the contract include [Defendant's] own regulations and the regulations of the [PRC].

10.     [Defendant] cannot deny service to [a company] for failing to pay the bill of another even as a guarantor of that bill.

---

[1] We have inserted this "[not]" in this finding, because the court determined in a later hearing that it had mistakenly omitted "not" when it entered this finding. The court corrected this in its amended judgment.

5

11.     The negligence of [Plaintiff's] management or employees caused 80% of the damages claimed.

12.     [Defendant] is 20% liable for any damages.

13.     The [c]ourt finds damages as follows:

        [A.]  Loss of Estancia Facility $7,150,000.00[,]
        [B.]  Loss of Grants equipment $500,000.00[,]
        [C.]  Lost crop less saved expense $13,704,828.00[.]

    All damages are reduced by comparative fault.

The court then entered a judgment, based on its findings of fact and conclusions of law, awarding "$21,354,882.00 for breach of contract, without application of comparative fault" and "$100,000 punitive damages for punitive fault occurring after the breach of contract." The court stated that no prejudgment interest would attach, but that post-judgment interest would accrue at 8.75%, that Defendant was entitled to certain set-offs, and that Plaintiff was to "elect [its] remedies after the time for appeal expires."

{12 }    Ultimately, the district court entered an amended judgment from which the present appeal is taken. The court awarded Plaintiff $21,354,882 for breach of contract "without application of comparative fault." The court denied Plaintiff's request for prejudgment interest and ruled that post-judgment interest would accrue at 8.75% based on breach of contract. The court also awarded Plaintiff $21,354,882 for negligence and, applying comparative fault principles, attributed 80% of fault to Plaintiff's negligent conduct. As to the tort damages, the court again denied prejudgment interest but held that post-judgment interest would accrue at the rate of 15% on the damages awarded. The court granted Defendant a set-off against the judgment of about $3 million. And the court required Plaintiff to elect its remedy "after the time for appeal expires."

{13}    In regard to punitive damages in the amended judgment, the court rejected Plaintiff's claims for punitive damages based on Defendant's conduct before the fire, but assessed $100,000 in punitive damages against Defendant for "impeding firefighters with the threat of liability in energizing the electricity." The court required Plaintiff to elect "under which theory of punitive damages it will proceed after the time for appeal expires."

{14}    We first discuss the points on appeal raised by Defendant. Afterward, we turn to the points raised by Plaintiff on cross-appeal. Defendant contends that the district court erred: (1) in awarding consequential damages for breach of contract, (2) in awarding punitive damages where no conduct relating to the breach of contract for which compensatory damages were awarded supported the imposition of punitive damages and where there was no factual or legal basis to award any punitive damages against the corporate defendant, and (3) in awarding more than $13 million in crop-loss damages where Plaintiff's expert's proffered crop-production levels were nearly twice what reliable and authoritative sources indicate were actually being achieved by experienced growers in the

6

southwest. Defendant's only issue on the negligence claim is with regard to the amount of lost profits awarded.

## DEFENDANT'S APPEAL—DISCUSSION

### I.      Allowance of Consequential Damages in Contract

{15}    Defendant contends that under New Mexico law on allowance of consequential damages in breach of contract cases, the district court's contract-damages award was erroneous. Plaintiff agrees that the full amount awarded constituted consequential damages. The parties characterize the issue of allowance of consequential damages in contract breach cases generally as one involving foreseeability. The district court's critical determination linking contract liability with contract damages was a finding of fact stating that Plaintiff's damages "were foreseeable and a proximate cause of Defendant's breach of contract, negligence[,] and negligence per se."[2] This constituted the sole mention of foreseeability in the entirety of the court's findings of fact, conclusions of law, and amended judgment.

{16}    The court nowhere indicated what "foreseeable" meant or in what way the damages were foreseeable. Nor did the court explain or enter findings that assist in attempting to discern on what evidence it relied to measure or assess and conclude that the damages suffered by Plaintiff were foreseeable. "Foreseeability" in breach of contract damages analysis in regard to recovery of consequential damages in New Mexico is a word in search of a particular meaning. The parties present differing views of what it means. In our view, in New Mexico "foreseeability" is but a catch-word or shorthand word for and, if it is used, can only be determined within the context of, a narrowly drawn rule from New Mexico case law, the elements of which should not be ignored in court findings or jury instructions. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.4(6), at 93-95 (2d ed. 1993) (discussing foreseeability as "a term of art, a kind of shorthand for the more complex idea that damages should be limited as the parties intended" or "for more complex ideas about the scope of the parties' bargain"). With the foregoing in mind and for want of an easier catch-word, we will call the issue before us "the foreseeability issue."

### A.      Standard of Review

{17}    We review de novo whether the district court applied the correct controlling legal principle to the facts and the court's application of that principle to the facts. *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 6, 140 N.M. 879, 149 P.3d 976.

---

[2] The court obviously meant to say that the damages were proximately caused by Defendant's breach of contract, negligence, and negligence per se, instead of saying that the damages were a proximate cause of the breach of contract, negligence, and negligence per se. This finding was adopted verbatim from Plaintiff's requested findings of fact and conclusions of law, which failed to indicate which were findings of fact and which were conclusions of law.

**B.    The New Mexico Rule on Consequential Damages in Contract**

{18}    Critical to the foreseeability issue is determining what the New Mexico rule is on allowance of damages in breach of contract. We discuss eight mainstay New Mexico cases beginning the discussion with *Price v. Van Lint*, 46 N.M. 58, 120 P.2d 611 (1941), and continuing chronologically. This discussion shows that the New Mexico rule on consequential damages in contract is derived from and to the present day follows the law expressed in *Hadley v. Baxendale* (1854), 156 Eng. Rep. 145, and *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540 (1903). We add to the discussion certain aspects of *Hadley* and *Globe Refining*.

{19}    The Court in *Price* set out rules to apply in instances of breach of contract to lend money. *Id.* at 66-68, 120 P.2d at 615-17. The Court began by stating that it was "the general rule that a breach of contract to loan money, standing alone, imposes no liability to damages[,]" but that this rule did not apply "where there are extraordinary circumstances . . . which result in injury." *Id.* at 67, 120 P.2d at 616. The Court determined that extraordinary circumstances in the case resulted in injury to the plaintiff and that the defendant was liable for consequential damages. *Id.* The Court in *Price* stated:

> "On breach of a contract to loan money where special circumstances were known to both parties from which it must have been apparent that special damages would be suffered from a failure to fulfill the obligation, such special damages as may appear to have been reasonably contemplated by the parties are recoverable. Thus, special damages may be recovered where the money is to be used for a particular purpose which is known at the time to the party agreeing to make the loan, provided, of course, that such damages are not speculative or remote."

*Id.* at 68, 120 P.2d at 617 (quoting 15 Am. Jur. *Damages* § 62, at 466).

{20}    In *Mitchell v. Intermountain Cas. Co.*, 69 N.M. 150, 364 P.2d 856 (1961), based on an insurer's failure under its policy to replace vehicle parts damaged in a flash flood, causing its insureds to be unable to make vehicle installment payments, and resulting in repossession of the vehicle, the insureds sued for the cost to replace the vehicle or pay the plaintiffs the value of the vehicle. *Id.* at 151-52, 364 P.2d at 856-57. The district court awarded the insureds the amount of their down payment for the vehicle. *Id.* at 151, 364 P.2d at 856-57. The insureds appealed. *Id.* at 151, 364 P.2d at 857. On appeal, based on an Annotated Law Reports annotation and two out-of-state cases, the Court set out the rule for allowance of damages in contract:

> Contractual damages recoverable for breach of the contract are those damages contemplated by the parties at the time of the making of the contract. Damages resulting from the breach of contract which could not reasonably have been within the contemplation of the parties are not recoverable.

8

*Id.* at 152, 364 P.2d at 857 (citation omitted). The Court in *Mitchell* determined that there was no basis for computing damages upon the theories advanced by the plaintiffs, stating:

> Neither [was] it indicated by any finding nor by any evidence pointed out to us that loss of the car by repossession was contemplated as a damage resulting from the covered risks at the time the contract was entered into. Therefore, the loss caused by repossession of the automobile [was] not damage recoverable under the contract by reason of the breach of the insurance contract to repair or replace.

*Id.* at 153, 364 P.2d at 858. The Court ordered the district court to vacate its judgment and enter a judgment dismissing the action by the plaintiffs. *Id.* at 155, 364 P.2d at 859.

**{21}** In *State Farm General Insurance Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974), an insurer sued in interpleader to obtain relief between a real estate contract buyer and seller. *Id.* at 758, 527 P.2d at 799. The seller counterclaimed against the insurer for damages resulting from the insurer's delay in payment of the loss, based on a fire that had damaged the property approximately one year before the insurer filed its action. *Id.* The Court in *Clifton* denied contract damages, stating:

> As to the aspect of recovery based on breach of contract, damages recoverable under this theory are those damages contemplated by the parties at the time of making the contract. None of the claimed damages were the natural and foreseeable consequences of the claimed breach, and, thus were not within the contemplation of the parties.

*Id.* (citations omitted).

**{22}** *E & B Specialties Co. v. Phillips*, 86 N.M. 331, 523 P.2d 1357 (1974), involved a claim by a subcontractor to recover damages for breach by the prime contractor on a construction subcontract. *Id.* at 332, 523 P.2d at 1358. The prime contractor counterclaimed for damages for breach of the subcontract resulting in the prime contractor having to pay liquidated damages as required in the prime contract. *Id.* The issue for the Court was whether the prime contractor could recover damages. *Id.* The Court referred to *Hadley* as "[t]he leading case most often quoted for the [general] rule" of foreseeability in measuring damages for breach of contract. *E & B Specialties*, 86 N.M. at 333-34, 523 P.2d at 1359-60. We set out here the *Hadley* language quoted in *E & B Specialties*, because several cases after *E & B Specialties* also cite *Hadley* for the law of recovery of consequential damages.

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances

under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such contract which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under those special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract.

*E & B Specialties*, 86 N.M. at 333-34, 523 P.2d at 1359-60 (internal quotation marks and citation omitted). We note the reference in Charles T. McCormick's *Handbook on the Law of Damages* (1935), to *Hadley* as "the landmark case" handed down in 1854 "which ever since has furnished the general standard by which English speaking courts all over the world have tested claims for damages for breach of contract." McCormick, *supra*, ch. 22, § 138, at 564. McCormick also states that "[w]hile it has occasionally been criticized, the acceptance in this country of the principle of *Hadley* . . . has been well-nigh universal by the courts[.]" McCormick, *supra*, 566 (footnote omitted). James J. White's and Robert S. Summers' *Handbook of the Law Under the Uniform Commercial Code* § 10-4, at 387 (2d ed. 1980), states that "[m]ost of the law regarding consequential damages can be traced back to the classic English case, *Hadley v. Baxendale*."

**{23}** The Court in *E & B Specialties* determined that the liquidated damages provision constituted "special circumstances" within the meaning of *Hadley* and stated, "damages which resulted from those special circumstances were recoverable only if they were communicated to or known by both parties at the time they entered into the subcontract." *E & B Specialties*, 86 N.M. at 334, 523 P.2d at 1360. The Court stated that the basis for the rule regarding recovery of damages resulting from special circumstances was "simply that":

Parties, when they enter into contracts, may well be presumed to contemplate the ordinary and natural incidents and consequences of performance or non-performance; but they are not supposed to know the condition of each other's affairs, nor to take into consideration any existing or contemplated transactions, not communicated nor known, with other persons. Few persons would enter into contracts of any considerable extent as to subject matter or time if they should thereby incidentally assume the responsibility of carrying out, or be held legally affected by, other arrangements over which they have no control and the existence of which [is] unknown to them.

*Id.* (internal quotation marks and citation omitted). The Court denied the prime contractor damages on the ground that "there [was] no evidence upon which the trial court could have correctly decided that the damages suffered . . . were foreseeable." *Id.* The Court specifically determined that no reasonable relationship existed between the work the subcontractor had contracted to do and the liquidated damages the prime contractor had been

10

assessed under the prime contract and that the liquidated damages "should not govern" as between the two parties "unless it was adopted by them as the measure of damages for any breach of their agreement." *Id.*

{24} In *Wall v. Pate*, 104 N.M. 1, 715 P.2d 449 (1986), which involved a seller's breach of an executory contract to sell property, the Court noted that "[t]he distinction between general and special damages arose in the touchstone case of *Hadley*" and, citing D. Dobbs, *Remedies* § 12.3, at 804 (1973), further stated that "[l]ater cases freely translated the rule of *Hadley* to mean that special damages may be recovered if the loss was foreseeable by the breaching party at the time of contracting." *Wall*, 104 N.M. at 2, 715 P.2d at 450. Referring to the foregoing as the "view of the kind of 'certain circumstances' leading to consequential and special damages" to which it had alluded in other cases, the Court pointed out that "Justice Holmes more critically analyzed the foreseeability of damages rule to include a 'tacit agreement' by the defendant to respond in damages for the particular damages understood to be likely in the event of breach." *Id.* (citing *Globe Refining*,190 U.S. 540). The Court adhered to Professor Dobbs' explanation of the basis on which special damages could be recovered, namely that: "[S]pecial damages may be allowed for items of loss more or less peculiar to the plaintiff, which may not be expected to occur regularly to other plaintiffs in similar circumstances, and are a likely loss within the contemplation of the parties at the time of contracting." *Id*. (citing Dobbs, *supra*, § 3.2, 12.3). "Stated another way, special provable damages flow from the disappointment of a special purpose for the subject matter of the contract or from unusual circumstances, either or both of which were known to the parties when they contracted." *Id.* The Court denied damages based on lack of evidence that certain circumstances were "known" to the sellers, were "foreseeably understood," or were an "anticipated benefit within the contemplation of either party when the contract was entered into." *Id.* at 2-3, 715 P.2d at 450-51.

{25} *Torrance County Mental Health Program, Inc. v. New Mexico Health & Environment Dep't*, 113 N.M. 593, 830 P.2d 145 (1992), involved a plaintiff's claim for damages for loss of the value of the corporation caused by the defendant's termination of a contract between the parties. *Id.* at 601-02, 830 P.2d at 153-54. The Court repeated the language in *Wall* from Professor Dobbs and also referred to *Restatement (Second) of Contracts* § 351(1) (1981), characterizing the section to say that "damages [are] not recoverable for loss that [the] breaching party did not have reason to foresee as [a] probable result of the breach when [the] contract was made." *Torrance County*, 113 N.M. at 602, 830 P.2d at 154. Noting that the issue had not been presented to the jury as to whether the defendant "could reasonably have foreseen, at the time the contract was entered into, that a breach would cause the complete destruction [of the value of the corporation]," the Court nevertheless stated:

> The question [of] whether [the defendant] could reasonably have anticipated
> a loss in value . . . of a quarter-million dollars when it executed a contract,
> terminable without cause on thirty days written notice, for an annual amount
> of $161,468, would almost seem to answer itself. In any event, the answer
> to this question calls for more evidence than appears on this record.

11

*Id.* at 602 n.6, 830 P.2d at 154 n.6.

**{26}** *Camino Real Mobile Home Park Partnership v. Wolfe*, 119 N.M. 436, 891 P.2d 1190 (1995), involved a buyer's action for breach of warranty on sale of a mobile home park, as to which the Court applied common law principles of warranty. *Id.* at 439, 442, 891 P.2d at 1193, 1196. The purchase contract warranted that the sewage system was in good working order and in compliance with all inspections and local ordinances. *Id.* at 440, 891 P.2d at 1194. As a result of problems that developed relating to the sewage system, the plaintiff sued the defendant for breach of contract, seeking consequential damages including fines paid to a state regulatory agency, loss of rents, and diminution in value of the park. *Id.* at 440, 446, 891 P.2d at 1194, 1200. In regard to loss of rents and diminution in value, the plaintiff argued "that its . . . damages . . . were suffered as a consequence of the breach because it was forced to divert funds to replace the sewage treatment plant and could no longer afford to maintain the . . . park properly." *Id.* at 447, 891 P.2d at 1201.

**{27}** The plaintiff in *Camino Real* sought lost profits and diminution in value damages due to the likely poor condition of the property to attract tenants or retain resale value if it were forced to repair the sewage treatment plant. *Id.* The Court focused in part on the fact that there was no evidence in the record that the plaintiff's precarious financial situation was made known to the defendant or that the defendant agreed, explicitly or tacitly, to protect the plaintiff, if there were a breach of warranty, from losses resulting from the plaintiff's financial inability to maintain the premises. *Id.* The Court stated that "[t]he fact that [the plaintiff] was in precarious financial shape was a special circumstance presenting the risk that it could not afford to maintain the . . . park in a condition to attract tenants or retain resale value if forced to repair the sewage treatment plant." *Id.* The Court then stated:

> The [defendant was] not imputed with knowledge of [the plaintiff's] affairs so as to place this risk within the contemplation of the parties; therefore, damages which resulted from those special circumstances were recoverable only if they were communicated to or known by both parties at the time they entered into the contract.

*Id.* (alteration omitted) (internal quotation marks and citation omitted).

**{28}** On the issue of consequential damages, the Court in *Camino Real* quoted language in *Wall* and described it as "essentially the rule expressed in . . . *Hadley*," that "a party breaching a contract is liable only for such consequential damages as were within the contemplation of both parties at the time of contracting." *Camino Real*, 119 N.M. at 446, 891 P.2d at 1200. The Court addressed the meaning of foreseeability, stating:

> Though sometimes described as a rule requiring "foreseeability" of harm for recovery of consequential damages, we believe that the foreseeability (or contemplation) of damages rule anticipates an explicit or tacit agreement by the defendant "to respond in damages for the particular damages understood to be likely in the event of a breach[.]

12

*Id.* (quoting *Wall*, 104 N.M. at 2, 715 P.2d at 450, and citing Justice Holmes' decision in *Globe Refining*, 190 U.S. at 543-44). The Court also quoted the language from *E & B Specialties*, 86 N.M. at 334, 523 P.2d at 1360, which we have quoted earlier in this opinion. *See Camino Real*, 119 N.M. at 447, 891 P.2d at 1201. The Court determined that the plaintiff failed to meet its burden of proof on consequential damages for lost profits and diminution in value of its property. *Id.*

**{29}** In *Jones v. Lee*, 1998-NMCA-008, 126 N.M. 467, 971 P.2d 858, a buyer sued a seller for the breach of a real estate contract. *Id.* ¶ 1. We relied on *Camino Real*, *Wall*, and *E & B Specialties*, and we referred generally, without comment, to *Restatement (Second) of Contracts* § 351(1). *Jones*, 1998-NMCA-008, ¶ 18. In regard to the district court's award of special damages, and citing *Camino Real* and *Wall*, this Court appears to have unintentionally conflated the two alternative *Hadley* standards for allowance of damages, stating:

> Special damages may be awarded . . . in a breach of contract case if the damages are shown to have resulted as the natural and probable consequence of the breach and, at the time of the formation of the contract, the breaching party reasonably knew or should have anticipated from the facts and circumstances that the damages would probably be incurred.

*Jones*, 1998-NMCA-008, ¶ 18. Importantly, the Court reiterated the standard stated in *Camino Real* and *Wall* that "the foreseeability of damages rule anticipates an explicit or tacit agreement by the defendant to respond in damages for the particular damages understood to be likely in the event of a breach." *Jones*, 1998-NMCA-008, ¶ 19 (alteration omitted) (internal quotation marks and citation omitted).

**{30}** What is unmistakable from the foregoing cases is that our Supreme Court and this Court have firmly embedded *Hadley* and *Globe Refining* in New Mexico law allowing consequential damages for breach of contract. The applicable language in *Hadley* is quoted in *E & B Specialties* and set out earlier in this opinion. Distinguishing tort from contract, Justice Holmes in *Globe Refining* stated:

> When a man commits a tort, he incurs, by force of the law, a liability to damages, measured by certain rules. When a man makes a contract, he incurs, by force of the law, a liability to damages, unless a certain promised event comes to pass. But, unlike the case of torts, as the contract is by mutual consent, the parties themselves, expressly or by implication, fix the rule by which the damages are to be measured.

*Globe Refining*, 190 U.S. at 543. Drawing on a hypothetical circumstance based on the facts of the case, the Court in *Globe Refining* stated that were the circumstance to exist, the Court would "have to consider . . . what the plaintiff would have been entitled to recover in that case," and the Court followed with, "that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." *Id.* at 544. The Court stated that

13

"[t]his point of view is taken by implication in the rule that a person can only be held to be responsible for such consequences as may be reasonably supposed to be in the contemplation of the parties at the time of making the contract." *Id.* (internal quotation marks and citation omitted). The Court further stated that "[t]he consequences must be contemplated at the time of the making of the contract" and not "after the contract was made and before breach." *Id.*

**{31}** According to *Corbin on Contracts*, *Damages* § 56.3, at 90 (rev. ed. 2005), a number of English cases after *Hadley* applied a stricter rule than that stated in *Hadley*, namely, "that there must be an express or implied manifestation of intent to assume the risk of foreseeable consequential damages." Corbin indicates that Justice Holmes, in *Globe Refining*, adopted "[t]his 'tacit agreement' test . . . for the [United States] Supreme Court as [f]ederal common law[.]" Corbin, *supra*, at 90. The *Handbook of the Law Under the Uniform Commercial Code* states that the tacit-agreement test is one of two approaches adopted to answer questions left from *Hadley*'s rule. *See* White & Summers, *supra*, § 10-4, at 389. White and Summers interpret the tacit-agreement test from *Globe Refining* as follows:

> The more restrictive or tacit agreement test permits the plaintiff to recover damages arising from special circumstances only if "the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, [such liability] when the contract was made. In effect, this test requires the plaintiff to prove that the parties had specifically contemplated that consequential damages might result and that the defendant actually assumed the risk of such damages.

White & Summers, *supra*, § 10-4, at 389 (alteration in original) (footnote omitted) (internal quotation marks omitted).

**{32}** Important for the present case, nothing in our case law explicitly or implicitly disfavors or rejects the tacit-agreement test or otherwise undermines or minimizes the *Hadley* and *Globe Refining* tests as to the allowance of consequential damages in breach of contract cases. To the contrary, the cases of *Camino Real*, *Wall*, and *Jones* have expressly adopted the *Globe Refining* test along with that in *Hadley*, making the combination unmistakably part of New Mexico's common law.

**{33}** Consolidating the elements as they are found in the New Mexico cases, in our view the only reasonable reading of the cases is that the tests in *Hadley* and *Globe Refining* comprise the common law contract damages rule in New Mexico. We will refer to the rule as the New Mexico rule. The New Mexico rule consists of the following elements. A non-breaching party may recover damages that are the natural and probable result of the other party's breach of contract. Such damages are allowed because the parties are presumed to have contemplated the ordinary and natural incidents or consequences of non-performance of the contract. *E & B Specialties*, 86 N.M. at 334, 523 P.2d at 1360; *Jones*, 1998-NMCA-008, ¶ 18. Consequential damages resulting from special circumstances may be allowed when, at the time of contracting, such damages were a likely loss in the contemplation of the parties; or, stated another way, when the contracting parties have reason to know at the time of contracting of special circumstances or a special purpose of the contract that is reasonably

likely to give rise to particular damages in the event of a breach. *Camino Real*, 119 N.M. at 446, 891 P.2d at 1200; *Wall*, 104 N.M. at 2, 715 P.2d at 450; *E & B Specialties*, 86 N.M. at 334, 523 P.2d at 1360; *Jones*, 1998-NMCA-008, ¶¶ 18-19. "[S]pecial provable damages flow from the disappointment of a special purpose for the subject matter of the contract or from unusual circumstances, either or both of which were known to the parties when they contracted." *Wall*, 104 N.M. at 2, 715 P.2d at 450; *see* McCormick, *supra*, § 138, at 562 (stating that under the rule in "[t]he leading case of *Hadley*[,] . . . losses must be either of the type usually resulting from breach of like contracts, or, if unusual, the circumstances creating the special hazard must have been communicated to the defaulter before he made the bargain"). Furthermore, the non-performing party must explicitly or tacitly agree to respond in damages for the particular damages understood to be likely in the event of a breach. *Camino Real*, 119 N.M. at 446, 891 P.2d at 1200; *Wall*, 104 N.M. at 2, 715 P.2d at 450; *Jones*, 1998-NMCA-008, ¶ 19.

**{34}**    The New Mexico rule, derived from *Hadley* and *Globe Refining*, is more limited and restrictive than the notion of foreseeability in the law of negligence or as relaxed in the Restatement or the UCC. *See Restatement (Second) of Contracts* § 351, cmt. a (stating that the requirement in foreseeability in contract "is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause . . . in tort or for breach of warranty"); Corbin, *supra*, at 91 (indicating that common law "[c]ourts have been willing to include in tort actions more remote and less easily foreseeable elements of injury than is the case in contract actions"); White & Summers, *supra*, § 10-4, at 389-90 (stating that the vast majority of jurisdictions that have followed UCC § 2-715(2) commentary command to reject the *Globe Refining* tacit-agreement test have "rejected the . . . test in favor of the less restrictive objective approach," which approach White and Summers characterize as "one of reasonable foreseeability of probable consequences" (footnote omitted) (internal quotation marks omitted)); *see also Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 870 (Colo. 2002) (stating that "the test derived from *Hadley* imposes a more restrictive foreseeability limitation" and that "[u]nder the tort standard, damages need only be reasonably foreseeable"); *Mattegat v. Klopfenstein*, 717 A.2d 276, 281 (Conn. App. Ct. 1998) (stating that the proximate-cause test used in assessing damages for negligent performance of a contract is "a less severe limitation of liability than the requirement of anticipation or foreseeability in breach of contract cases").

**{35}**    To say that much has been written on what the rules in *Hadley* and *Globe Refining* appear to say and to mean and how they are to be applied would be a gross understatement. We turn to Professor Dobbs' handbook.[3] Dobbs calls *Hadley*'s contemplation-of-the-parties limitation "[t]he moral basis for limiting contract liability" and explains that this moral basis "lies in the idea that the boundaries of contract liability are determined by the contract itself; the scope of the risks assumed by the defendant delineate the scope of his liability." Dobbs, *supra*, § 12-4(5), at 85. Dobbs states:

---

[3] Dobbs' handbook is cited in New Mexico cases. *See, e.g.*, *Camino Real*, 119 N.M. at 443, 891 P.2d at 1197; *Torrance County*, 113 N.M. at 602, 830 P.2d at 154; *Wall*, 104 N.M. at 2, 715 P.2d at 450.

Although the promise of a contract is almost always written in terms of performance required . . . the parties usually have some ideas about the kinds of risks which performance is meant to guard against. Their understanding of the contract's purposes conditions their understanding of the liabilities they undertake.

The moral understanding of *Hadley* is that it attempts to respect those understandings of the parties. Damages are not, in other words, measured by a rule of law imposed from above, but by the parties' own agreement. This idea is in line with the usual rule that general damages—based on the value of the very performance promised—are always recoverable, while special or consequential damages may be denied unless the defendant explicitly or impliedly undertook to guarantee against consequential damages. The idea is also part of a web of principles that relieve parties from obligations when they did not contemplate supervening events that frustrate the contract's purposes[.]

*Id.* (footnote omitted). Dobbs notes that *Hadley* did not use the term "foreseeability" but formulated its rule by ruling that a defendant would not be liable for special damages not within the contemplation of the parties at the time of contracting. Dobbs, *supra*, § 12.4(6), at 91. Under *Hadley*, according to Dobbs, "[f]oreseeability would not be the ultimate test of liability; whether the parties expected to shift the particular risk to the defendant would be the test." Dobbs, *supra*, § 12.4(6), at 92. Dobbs explains the *Globe Refining* decision as applying the *Hadley* rule "in line with the moral rationale by saying that the defendant would be liable only for consequential damages for which the defendant explicitly or tacitly agreed to accept liability." Dobbs, *supra*, § 12.4(6), at 92.

{36}     Professor Dobbs points out that a rationale of the rule in *Hadley* is that "liability must stop somewhere and that courts must have a language for stating the stopping place." Dobbs, *supra*, § 12.4(5), at 91. In addition, Dobbs raises concerns about the possible impermissible conflation of different foreseeability concepts or tests, stating that "[t]he fact that a particular item of consequential loss is factually foreseeable does not necessarily show that either party expected the defendant to pay damages for such a loss." *Id.* § 12.4(6), at 94. Dobbs shows that "courts often recognize that if 'foreseeability' is to be the test at all, it must not be understood as a simple factual term but as a term of art, a kind of shorthand for the more complex idea that damages should be limited as the parties intended." *Id.* This observation led Dobbs into a discussion of *Kenford Co. v. County of Erie*, 537 N.E.2d 176 (N.Y. 1989), as a case that "illustrates this point well." Dobbs, *supra*, § 12.4(6), at 91 n.3, 94.

{37}     *Kenford* does provide guidance on both *Hadley* and *Globe Refining* and on the restrictive nature of what must be in the contemplation of the parties. In *Kenford*, the plaintiff contracted with the county to donate land to the county for construction of a stadium and, in reliance on the contract, obtained property in the periphery of the proposed stadium in anticipation of the increase in land values that would result from building the stadium. 537 N.E.2d at 176-77. When the county decided not to build the stadium, the plaintiff sued

16

the county for breach of contract and for damages for the loss of anticipated appreciation of the value of land owned in the periphery of the proposed stadium site. 537 N.E.2d at 177-78. In *Kenford*, relying on *Hadley*, *Globe Refining*, and several other cases including its earlier decision in *Chapman v. Fargo*, 119 N.E. 76 (N.Y. 1918), the Court of Appeals of New York first set out the rule for consequential damages recovery.

> It is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach. In order to impose on the defaulting party a further liability than for damages which naturally and directly flow from the breach, i.e., in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting. In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.

*Kenford*, 537 N.E.2d at 178-79 (alterations omitted) (internal quotation marks and citations omitted).

{38}    The court in *Kenford* noted that the parties "harbored an expectation and anticipation that the proposed domed stadium facility would bring about an economic boom . . . and would result in increased land values and increased property taxes." 537 N.E.2d at 179. In fact, it was clear that the county was aware that the plaintiff had acquired and intended to acquire peripheral lands. *Id.* However, the court determined that the county's knowledge "in and of itself, [was] insufficient, as a matter of law, to impose liability on the [c]ounty for the loss of anticipated appreciation in the value of those lands since the [c]ounty never contemplated at the time of the contract's execution that it assumed legal responsibility for these damages upon a breach of the contract." *Id.* Further, the court could not conclude that the plaintiff's "hope or expectation of increased property values and taxes necessarily or logically leads to the conclusion that the parties contemplated that the [c]ounty would assume liability for [the plaintiff's] loss of anticipated appreciation in the value of its peripheral lands if the stadium were not built." *Id.* The court determined that:

> [T]here is no provision in the contract . . . nor is there any evidence in the record to demonstrate that the parties, at any relevant time, reasonably contemplated or would have contemplated that the [c]ounty was undertaking a contractual responsibility for the lack of appreciation in the value of [the plaintiff's] peripheral lands in the event the stadium was not built.

*Id.*

**{39}**   The court in *Kenford* brought its discussion to a close with the following sanguine commentary.

> Thus, the constant refrain which flows throughout the legion of breach of contract cases dating back to the leading case of *Hadley* . . . provides that damages which may be recovered by a party for breach of contract are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed.  The evident purpose of this well-accepted principle of contract law is to limit the liability for unassumed risks of one entering into a contract and, thus, diminish the risk of business enterprise.

*Id.* at 180 (citations omitted).  The court held that, under *Hadley* and its progeny of New York cases, the plaintiff was not entitled to recovery.  *Id.*

**C.     The Lack of Findings and Evidence to Support
        Consequential Damages in Breach of Contract**

**{40}**   The concept of foreseeability in contract damages cannot be applied usefully absent definite elements.  The New Mexico rule provides the linkage from breach of contract to consequential damages that flow from special or unusual circumstances.  The rule consists of various elements that must be considered.  In court-tried cases, the district court should enter findings of fact and conclusions of law that explicitly address those elements.  Further, as we discuss later in this opinion, tort concepts of reasonable foreseeability in determining duty and proximate cause do not appear in the New Mexico cases that set out the elements governing allowance of consequential damages in contract.  In deciding the foreseeability issue under the New Mexico rule on allowance of consequential damages in contract cases, it is error to apply those tort concepts.

**{41}**   The parties in the present case appear to have tried the case under a foreseeability concept that was not defined by the elements in the New Mexico rule or clearly defined at all.  The district court's lone finding linking Plaintiff's contract damages to the parties' contract, stating that Plaintiff's damages were foreseeable and a proximate cause of Defendant's breach of contract, in all probability resulted from the parties' requested findings of fact—requested findings that failed to define the elements in the New Mexico rule for contract-based consequential damages.  Shortly after the court entered its findings of fact and conclusions of law, the parties argued the application of New Mexico law and *Hadley*.  Some nine months after those arguments, the court entered its initial judgment followed by its amended judgment over three months after entry of its initial judgment.

**{42}**   During the considerable time that passed from the time the parties expressly argued the New Mexico case law and *Hadley* and the time of entry of its amended judgment, the court presumably visited the New Mexico law and *Hadley* and considered the elements required for consequential damages in contract under that law.  Yet the district court gave no indication its ultimate disposition regarding consequential damages in contract was based on the applicable New Mexico case law, including *Hadley* and *Globe Refining*.  No findings

18

of fact entered by the court permit one to reasonably infer that the damages awarded ordinarily followed from any special or unusual circumstances known by or communicated to Defendant. We are left without reference to or finding of what the parties understood or contemplated in forming their contract, or as to whether Defendant had reason to know at the time of contracting from special, particular, or unusual circumstances that the type of damages that occurred would likely or probably occur. Nor did the court give any indication that it considered whether there existed an explicit or tacit agreement by Defendant to respond in damages for the particular damages understood to be likely in the event of a breach. In sum, no evidence exists of or from any court determination that the court applied the New Mexico rule or of any element in or aspect of that rule.

{43}    As of entry of the district court's amended judgment, the court's determinations from which we can ascertain how the court arrived at its consequential damages award are (1) a conclusion of law that Defendant breached the contract by failing to provide advance notice of the disconnect of electrical service to Plaintiff, and (2) a general finding of fact adopted verbatim from Plaintiff's requested findings of fact that Plaintiff's damages were foreseeable and a proximate cause of Defendant's breach of contract, together with a conclusion of law repeating that the breach caused Plaintiff's damages. The court's determinations are not adequate under the New Mexico rule to support the court's award of consequential damages for breach of contract.

{44}    Although we assume that the district court read the New Mexico case law as we set it out earlier in this opinion and was equally aware of the embedded status of *Hadley* and *Globe Refining* in the cases, we are unable from the record and from the court's determinations to presume that the court actually applied the New Mexico rule to the facts in this case. In fact, based on Plaintiff's bare requested finding of fact of foreseeability and proximate cause, and also on Plaintiff's focused arguments to the court on the applicability of tort standards of reasonable foreseeability and proximate cause, it is reasonable to conclude that the court misapplied the applicable law or otherwise misapprehended the elements and restrictive nature of the New Mexico rule and, instead, injected and applied erroneous elements in its ultimate determination of allowance of consequential damages in contract.

{45}    Plaintiff in fact argues here, as it did in the court below, that the *Hadley* and *Globe Refining* tests in the New Mexico cases are objective standards and that because an objective standard is a tort standard, the New Mexico cases are to be read to allow consequential damages under the tort concepts and standards of reasonable foreseeability and proximate cause. Plaintiff argues that New Mexico law is "clear" that the breaching party "is responsible for all damages that proximately result from [the] breach, including consequential damages that are reasonably foreseeable," citing UJI 13-843 NMRA. Plaintiff has explained that, as between foreseeability in a contract case and foreseeability in a tort case, "for purposes of this case and . . . in the giant run of these foreseeability cases for contract law there's really no difference." We reject these arguments. The New Mexico cases following *Hadley* and *Globe Refining* and incorporating their rules as we have set them out earlier in this opinion do not rely on proximate cause or make it an element. Furthermore, to say that the cases call simply for an undefined "reasonably foreseeable"

19

standard is to disregard the elements in the New Mexico rule. Nor, for that matter, does UJI 13-843 use the word "foreseeable," much less the words "proximately," "proximate cause," or "consequential damages." Further we simply do not agree, as Plaintiff essentially argues, that the elements set out in the New Mexico cases may be ignored and that the only standards or elements to apply in considering whether to allow consequential damages in breach of contract, based on what was in the contemplation of the parties at the time of contracting, are the tort standards of reasonable foreseeability and proximate cause.

{46}    Plaintiff nevertheless seeks to somehow convert the district court's standard of reasonable foreseeability and proximate cause into a contract standard by arguing that circumstances known to Defendant at the time of contracting make Defendant liable for consequential damages. Among those circumstances is a finding of fact that certain employees of Defendant testified "that it was well known within the community that [this facility] was a hydroponic tomato production facility."[4] Plaintiff also asserts (with no citation to the record, but obviously based on notions of sound business objectives) that Defendant knew Plaintiff was in business to turn a profit. Plaintiff further asserts that Defendant knew Plaintiff was a successor to Agstar, which Defendant knew was a commercial business using the greenhouse facility to grow crops. Thus, from nothing more than Defendant knowing Plaintiff was a for-profit hydroponic tomato operation, Plaintiff argues Defendant "was aware of the essential role of continuous electric service in [Plaintiff's] business operations and that interruption of electric service could have catastrophic impact on [Plaintiff's] crops and business" and on the "integrity" of its physical facilities and operations, and that the interruption could cause lost profits. Plaintiff further argues that "[t]he proper inquiry is whether the fact of loss (not the precise mechanism of the loss) is foreseeable." Plaintiff asserts that the scope or extent of the loss is not to be considered. We do not agree with these arguments.

{47}    Matters beyond the mere fact of loss are to be considered. Plaintiff nowhere provides record proof or any persuasive argument that the parties contemplated or that Defendant understood at the time of contracting that a failure of advance notice of a disconnect would probably cause Plaintiff to not be able to obtain water necessary to quench a fire that might start somewhere in the facility while the power was off and then spread to other parts of the facility. Equally absent is proof or persuasive argument that the parties contemplated or that Defendant understood at the time of contracting that it was assuming a risk of liability for the type or extent of damages that occurred. Further, the remoteness of the consequences of the fire damage from the failure to give advance disconnect notice should not be ignored. *See, e.g., Coker v. Sw. Bell Tel. Co.*, 580 P.2d 151, 152-53 (Okla. 1978) (holding that on a theory of recovery for breach of contract under the *Hadley* rule the damages that the plaintiff sought, which were based on a fire that destroyed the plaintiff's business after he was unable to contact the fire department because of the defendant's inoperative pay telephone, were "too remote and speculative to permit recovery"); *Roberts v. TXU Energy Retail Co.*, 171 S.W.3d 901, 902, 904 (Tex. App. 2005) (holding in a negligence action that the

---

[4] This is a finding only that something was stated in testimony. It is not a finding of a fact that something was well known in the community.

circumstances of the children's deaths "were too remotely connected with [the defendant's] disconnection of electricity to constitute the cause in fact of the deaths").

{48}    The closest Plaintiff gets to any evidence relating to such contemplation or understanding of the parties is the fire chief's testimony that the availability of water to put out fires was a concern in rural settings and that the fire chief had worked with Plaintiff prior to the fire to install fittings on a well pump so that firefighters could access water. We do not see how Plaintiff's cooperating with the fire chief entered Defendant's knowledge at the time of contracting of Plaintiff's contractual needs or assumptions, or how this evidence can support a conclusion that Plaintiff was entitled to consequential damages in contract. We see no reasonable basis on which a jump can be made from the circumstances Plaintiff sets forth to a conclusion that the particular damages or type of damages that occurred were contemplated by the parties to be a likely loss. Nor do we see that a jump can be made to a conclusion that the damages flowed from particular, unusual circumstances of which the parties were aware at the time of contracting or to a conclusion that Defendant tacitly agreed to respond in damages understood to be likely in the event of a breach.

{49}    Thus, we do not see how any of the court's findings or any evidence on which Plaintiff relies is sufficient for a conclusion that Defendant could be liable to Plaintiff under the New Mexico rule for the awarded consequential damages. We see no evidence in the court's findings of fact, and Plaintiff points to no evidence in the record, to support any ultimate finding of fact or conclusion of law that supports application of the New Mexico rule to permit Plaintiff's recovery of consequential damages for breach of contract.

{50}    Perhaps anticipating that its evidence relating to circumstances known to the parties at the time of contracting may be insufficient, or that its tort-based, reasonably foreseeable, proximate-cause standard might not be applicable, Plaintiff wants this Court to evaluate contract damages by looking at what was foreseeable to Defendant at the time of the breach instead of at the time of contract. Plaintiff provides a lengthy footnote argument that states, "[w]hile generally, foreseeability is determined at the time of contracting, the rule is not as rigid as [Defendant] argues" and that "courts have recognized that special circumstances allow for foreseeability to be measured at the time of the breach of contract[.]" Apparently to support this argument, Plaintiff states that Defendant's refusal to reconnect the power "was a second breach of contract" from which damages flowed. We reject and will not further address these footnoted arguments and statements other than to point out that the district court did not find or conclude that Defendant's failure to reconnect the power constituted a breach of contract for which consequential damages were awarded. In determining that punitive damages should be awarded and concluding that Defendant's threat of liability if it reconnected the power was a breach of contract, the court was attempting to link an award of punitive damages to a contract breach. The court nowhere determined that this breach resulted in consequential damages. Further, Plaintiff cites no New Mexico authority for its contention that foreseeability can be measured at the time of the breach, and Plaintiff cites no foreign authority that persuades us that in this case we should consider a theory of contemplation at the time of breach instead of at the time of contracting. Also, Plaintiff's argument constitutes yet another indication that it wants this

Court to affirm a much less restrictive test such as the tort-based standard for negligence applied by the district court.

{51}    We think it is important to note here that the New Mexico Uniform Jury Instruction on the question of allowance of consequential damages under the New Mexico rule is of no assistance.  It allows the jury to find damages constituting what the plaintiff could reasonably have expected to gain if the defendant had not breached the contract, and it allows to be inserted as a proper element of damages "[a]ny damages found by you must be damages which, at the time of making the contract, the parties reasonably could have expected to be a consequence of any breach." UJI 13-843 NMRA.  In an apparent effort to keep the New Mexico law simple for a jury, the committee commentary to UJI 13-843 confuses and might well misinterpret the *Hadley* standards and the New Mexico case law, stating that "[t]he elements of damages must be the natural and foreseeable consequences of the breach, as contemplated by the parties at the time of making the contract[,]" citing but perhaps mis-using the early cases of *Clifton* and *Mitchell* as authority.  The instruction does not instruct the jury regarding the elements as they are stated in the New Mexico cases.  Nor does it even instruct the jury to consider, as the commentary appears to suggest it should, whether the damages are the "natural and foreseeable" consequence of the breach.  Further, we question whether the commentary's "natural and foreseeable" test is an accurate one.

**D.    Inapplicable Departures From *Hadley* and *Globe Refining***

{52}    The Restatement (Second) of Contracts and the UCC have departed from *Hadley* and *Globe Refining*.  The Restatement and the UCC have liberalized the test for allowance of consequential damages thereby reducing a plaintiff's proof burden, but they have provided means to allocate damages when the defendant should not be saddled with the full amount. We discuss these authorities because Plaintiff relies on the Restatement's more liberal approach to support the tort-based standard it advances, while ignoring or rejecting its Section 351(3) safety net.  Plaintiff also relies on the UCC's more liberal approach, while ignoring or rejecting its Section 55-2-715(2)(a) damages-allocation provision.  We do not view either authority as governing or even instructive in deciding the present case.

**1.    The Restatement (Second) of Contracts**

{53}    The Restatement (Second) of Contracts sets out standards that read differently than those in the New Mexico rule.  *See* Dobbs, *supra*, § 12.4(4), at 83, § 12.4(6), at 95-96 (stating that the Restatement's rule "differs radically from the *Hadley* way of limiting damages," and is "a completely different formulation of the [*Hadley/Globe Refining*] limitations," but that "it provides a new kind of limitation on damages recovery[,]" namely, that a court "may limit damages as a matter of discretion").  Relating to unforeseeability and related limitations on damages, Section 351 of the Restatement (Second) of Contracts now states:

> (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2)  Loss may be foreseeable as a probable result of a breach because it follows from the breach

    (a) in the ordinary course of events, or

    (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

**{54}**    The *Restatement (Second) of Contracts* § 351, cmt. (a), explicitly rejects the tacit agreement test. *See* William Burnett Harvey, *Discretionary Justice Under The Restatement (Second) of Contracts*, 67 Cornell L. Rev. 666, 676 (1982) (referring to rejection in the Restatement of the tacit agreement test and stating, "[n]ot surprisingly, . . . the proposal that the discretionary limitation of [S]ection 351(3) be replaced by a tacit agreement requirement encountered resistance"). Our appellate courts have referred to Section 351. *See Torrance County*, 113 N.M. at 602, 830 P.2d at 154; *Jones*, 1998-NMCA-008, ¶ 18; *Manouchehri*, 1997-NMCA-052, ¶ 25.

**{55}**    As though the Restatement saw difficulty in applying the standards it proposes, and likely concerned about injustice in circumstances such as those in the present case in which negligence in the breach of a contract can result in significantly greater consequential damages being awarded in contract than in negligence, the Restatement in Section 351(3) leaves it to the court's discretion to limit damages for loss determined to be foreseeable by "excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." Amici in this case have briefed the issue whether this Court should adopt Section 351(3) of the Restatement. While some of the New Mexico cases refer to Section 351, we do not see where any part of Section 351 has expressly been adopted and applied in New Mexico[5], and we do not in this opinion adopt Section 351 or rely on it as authority for any holding. Nor do we render any evaluative judgment on whether the section should be adopted. Section 351 is substantially different than the New Mexico rule. Before any decision is made to adopt Section 351 or any part of it, care and caution should be taken to first study the section in considerably more detail than has been done in the New Mexico cases that have referred to it.

## 2.    The Uniform Commercial Code

**{56}**    Section 55-2-715(2) provides:

---

[5]  We note that the Tenth Circuit Court of Appeals has incorrectly, we believe, indicated that New Mexico "follows the *Restatement of Contracts* regarding foreseeability." *O'Toole v. Northrop Grumman Corp.*, 305 F.3d 1222, 1227 n.3 (10th Cir. 2002) (citing *Reed v. Aaacon Auto Transport, Inc.*, 637 F.2d 1302, 1305 (10th Cir. 1981), *overruled on other grounds by Underwriters at Lloyds of London v. N. Am. Van Lines*, 890 F.2d 1112 (10th Cir. 1989), and *Clifton*, 86 N.M. at 758, 527 P.2d at 799, two cases that do not support *O'Toole*'s footnoted statement).

Consequential damages resulting from the seller's breach include:

(a)  any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b)  injury to person or property proximately resulting from any breach of warranty.

Official Comment 2 for Section 55-2-715 states:

Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach.  The "tacit agreement" test for the recovery of consequential damages is rejected.  Although the older rule at common law which made the seller liable for all consequential damages of which he had "reason to know" in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise.  Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.

{57}    Corbin points out that UCC § 2-715(2) "changes the relevant time of the foreseeability of damages" and "has relaxed the requirement of foreseeability considerably." Corbin, *supra*, § 56.3, at 92.  Corbin's explanation for this interpretation of the UCC is that "[u]nder the [UCC] it is not necessary that the seller have reason to know at the time of contracting that no substitute will be available to the buyer.  It is sufficient that at the time of the breach no substitute is reasonably available and that the seller had reason to know the buyer's needs."  *Id*. (footnotes omitted).

{58}    White and Summers state that UCC § 2-715(2) is an approach to interpreting *Hadley* essentially chosen to counter the tacit-agreement approach in *Globe Refining*. *See* White & Summers, *supra*, § 10-4, at 389. White and Summers notes that comment 2 of the section says that "[t]he 'tacit agreement' test for the recovery of consequential damages is rejected." *Id*.  They then explain:

Section 2-715(2) holds the defendant liable for 'any loss resulting from general or particular requirements for which the seller at the time of contracting *had reason to know*. . . .' (emphasis added).  In other words, 'the test is one of reasonable foreseeability of probable consequences.'

*Id*.  They further state that the test is an objective one and is consistent with *Hadley*'s wording that the defendant is liable for such loss "as may reasonably be supposed to have been in the contemplation of both parties."  White & Summers, *supra*, § 10-4, at 389 (emphasis omitted).

24

**{59}** The UCC is legislatively created and as such does not impact application of the New Mexico rule in cases that are not under the UCC, including the present case. Plaintiff nevertheless relies on a UCC case, *Manouchehri v. Heim*, 1997-NMCA-052, 123 N.M. 439, 941 P.2d 978 (Ct. App. 1997). The plaintiff sought consequential damages specifically under Article 2 of the Uniform Commercial Code (UCC) for breach of warranty because a machine they had purchased had less power than had been represented. *Manouchehri,* 1997-NMCA-052, ¶¶ 10, 25. Based on the UCC, this Court determined that "[o]n the evidence at trial the district court could properly find that lost income would be a foreseeable consequence of an underpowered x-ray machine." *Id.* ¶ 25. The governing UCC provision stated that "[c]onsequential damages resulting from the seller's breach include . . . any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know." NMSA 1978, § 55-2-715(2)(a) (1961); *Manouchehri*, 1997-NMCA-052, ¶¶ 10, 23. The issue before the Court was governed by the UCC and not by the common law based on *Hadley* and *Globe Refining*, yet the Court inexplicably and, in our view, perhaps incorrectly, referred to principles discussed in *Camino Real*, *Restatement (Second) of Contracts* § 351(3), and certain scholarly articles. *See Manouchehri*, 1997-NMCA-052, ¶ 25. In that discussion, the Court stated that the plaintiff did not need to tell the defendant how much income he would earn from the use of the machine in order to recover consequential damages "so long as the consequence of lost income was reasonably foreseeable." *Id*. Because *Manouchehri* was decided under Section 55-2-715(2), it has no applicability to the present case.

### E. The Court's Contract Damages Award Cannot Stand

**{60}** The *Hadley* and *Globe Refining* tests and rationales are embedded in the New Mexico cases. We are not persuaded to move to a more liberal formula, such as the tort-based reasonable foreseeability and proximate-cause standards advanced in this case by Plaintiff. *See* Dobbs, *supra*, § 12.4(6), at 92 & n.8 (stating that "[i]n general, judicial decisions and even statutes have moved away from the tacit agreement formulation in favor of a more liberal formula based on 'foreseeability'"; that "[t]he tacit agreement rule seems . . . to come closer to the moral rationale for the *Hadley* rule than any other formula"; and also stating that "[h]ostility to the tacit agreement rule may be grounded in the belief that the law rather than the parties must provide a damages rule" (footnotes omitted)). Plaintiff unmistakably seeks to replace the *Hadley* and *Globe Refining* damages elements in the New Mexico rule, which are grounded in the notion of a bargain and risk allocation between contracting parties, with tort-based objective, reasonable foreseeability, and proximate-cause-grounded law and standards. Our Supreme Court is at liberty to overturn or "clarify" its precedent. We are not at liberty to do so, nor are we inclined to attempt a spin on the New Mexico rule that liberalizes it as Plaintiff wants to do.

**{61}** Furthermore, we do not believe that a move away from *Hadley* and *Globe Refining* and the New Mexico rule is wise, unless at the same time a defendant is assured of meaningful protections against disparate outcomes in damages awards such as those in the present case. *See Outboard Marine Corp. v. Babcock Indus.*, 106 F.3d 182, 184 (7th Cir. 1997) (stating that mitigation of damages in contract law corresponds to avoidable consequences in tort law and that "[t]ort and contract law have similar aims, and their

25

doctrines tend therefore to be isomorphic"); 24 Samuel Williston, *A Treatise on The Law of Contracts* § 64:15, at 147 (Richard A. Lord, 4th ed. 2002) ("The true reason why notice to the defendant of the plaintiff's special circumstances is important is because, just as a court of equity under circumstances of hardship arising after the formation of a contract may deny specific performance, so a court of law may deny damages for unusual consequences where the defendant was not aware when it entered into the contract how serious an injury would result from a breach." (footnote omitted)). Such protections exist in the *Restatement (Second) of Contracts* § 351(3) relating to disproportionate outcomes, in Section 55-2-715(2)(a), relating to loss that could "reasonably be prevented by cover or otherwise," and, for example, along the lines of *Outboard Marine*, which acknowledges that there was no contract doctrine of contributory or comparative negligence, but which distinguishes duties in contract and tort and recognizes the application of the doctrine of mitigation of damages in computing contract damages. *See Outboard Marine*, 106 F.3d at 184-85 ("[I]t does not follow from the absence of a general duty of care on the part of contract promises that a promisee's fault is irrelevant *in computing damages*."). Thus, even were a more liberal formulation to control, there exists no reasonable basis on which to allow recovery of all of the consequential damages resulting after a breach of contract where the evidence reflects that the defendant should not be saddled with the entire amount of damages.

**{62}** In sum, we hold fast to the New Mexico rule of damages in contract breach cases as that rule has developed over fifty years by our Supreme Court starting with *Price* and ending with *Camino Real*, and also by this Court in *Jones*. These cases and the New Mexico rule, as we have pieced the elements together, reflect established precedent. Furthermore, we see no reasonable basis in New Mexico case law or otherwise to abandon the restrictive New Mexico rule for Plaintiff's considerably more liberal rule which permits an all-or-nothing recovery in contract.

**{63}** Although our ruling disposes of the foreseeability issue, it is important nevertheless to discuss the obvious discordance of the different awards in this case of $21 million in contract and $4 million in negligence. In connection with contract damages, Defendant argues that the district court should have considered the fact that the damages of the type and magnitude incurred by Plaintiff were largely caused by Plaintiff's acts and omissions. Defendant further argues that the disproportionality between the contract price and the loss shows that the damages were not foreseeable. *See Restatement (Second) Contracts* § 351, cmt. f (stating that one circumstance to consider as to whether the contract was intended to cover the risk of liability for consequential damages "is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question"); *see also Sundance Cruises Corp. v. Am. Bureau of Shipping*, 7 F.3d 1077, 1084 (2d Cir. 1993) (citing the Restatement's comment (f) and observing that "the great disparity between the fee charged . . . and the damages sought . . . is strong evidence that such a result was not intended by the parties"); *Maine Rubber Int'l v. Envtl. Mgmt. Group*, 324 F. Supp. 2d 32, 37 (D. Me. 2004) (citing the Restatement's comment (f) and stating that "[a] contract price's lack of proportionality to the loss may indicate whether such damages were foreseeable"); *Robotic Vision Sys., Inc. v. Cybo Sys., Inc.*, 17 F. Supp. 2d 151, 160 (E.D.N.Y. 1998) (indicating that a disparity could implicate Section 351(3) of the Restatement). Defendant argues that the relatively small amount charged for service under the contract dwarfed the

over $21 million in damages awarded, and could not seriously be "intended to cover the risk of liability in the magnitude awarded." Defendant also argues that there exists "no reason why disproportionality cannot be considered in determining whether a consequential damages award was reasonably contemplated by the parties at the time they entered into the contract."

{64}  Based on our holding that reverses the contract consequential damages award for the reasons we have stated, we will not address the foregoing disproportionality argument. However, the disproportionality question causes us to consider the propriety of awarding $21 million to Plaintiff in breach of contract damages, while at the same time awarding approximately $4 million to Plaintiff for negligence damages where the contract breach and the breach of the duty to exercise ordinary care arise from identical conduct, and the damages are the same for that conduct. The issue cannot be ignored or written off with arguments, as made by Plaintiff, that comparative fault is not considered in breach of contract cases and that contract damages are awarded under theories of assumpsit and strict liability, whereas negligence damages are based on wrongdoing and, therefore, a plaintiff's own actions and failures to act that cause a part of the damages cannot be considered in allocating risk or responsibility for the damages.

{65}  Without a more rational explanation supporting the disproportionality, we do not see how such vastly different amounts awarded could be sustained even were the foreseeability issue decided in Plaintiff's favor under the New Mexico rule or even under the standard applied by the district court in the present case. Missing in this case was an analysis of the extent to which Plaintiff's actions and failures to act contributed to its own damages on the contract claim. *See Air Ruidoso, Ltd. v. Exec. Aviation Ctr., Inc.*, 1996-NMSC-042, ¶ 14, 122 N.M. 71, 920 P.2d 1025 ("It is a well established principle in New Mexico that an injured party has a responsibility to mitigate its damages, or run the risk that any award of damages will be offset by the amount attributable to its own conduct."); *Skeen v. Boyles*, 2009-NMCA-080, ¶ 31, 146 N.M. 627, 213 P.3d 531 (same). By its findings of fact and conclusions of law relating to comparative negligence, it is obvious that the district court believed that Plaintiff should have avoided or have mitigated against the fire and its spread and magnitude. Certainly under the court's more liberal tort-based standard, it was incumbent on the court, under the circumstances of this case, to iron out the allocation or apportionment of contract damages according to risk and responsibility for the damages. As we discuss in more detail in this opinion's next section, given the more liberal tort-based standard applied by the district court, the court's ultimate determination that contract damages were not to be reduced and that the full amount of damages should be awarded in contract to Plaintiff is not supportable or sustainable.

{66}  In conclusion, we reverse the district court's award of consequential damages given: (1) the absence of any evidence, findings supported by evidence, and conclusions supported by findings, that are necessary to support the award in accordance with the New Mexico rule; (2) the court's lone use of "foreseeable" in its contract liability and damages elements determinations without any more specific application of the elements contained in the New Mexico rule; (3) the court's misuse of proximate cause in its contract damages determination; (4) the court's failure under its recovery standard to consider an allocation

27

of damages pursuant to which Plaintiff would also be held responsible for damages; and (5) Plaintiff's failure to prove the elements of the New Mexico rule on allowance of the damages awarded.

**G.    The Allowance of Consequential Damages in Contract Were Plaintiff's Tort Standard to Be Applied**

**{67}**    The foregoing discussion leads us into what approach to contract damages we would take were we to determine that Plaintiff's tort standard applied to support the district court's having held Defendant liable in contract for the entirety of the consequential damages. Plaintiff insists that the tort standard of reasonable foreseeability and proximate cause is the applicable standard for recovery of consequential damages in contract. Plaintiff's approach essentially equates contract liability for consequential damages with negligence liability for the same damages. If Plaintiff insists on that equivalence, Plaintiff's recovery in contract should be limited to that in negligence.

**{68}**    It is particularly problematic in this case that Plaintiff carefully chose tort concepts and standards of reasonable foreseeability and proximate causation for a contract damages analysis, yet at the same time completely detached from the contract damages analysis any notion that the non-breaching party's own contributing actions and failures to act would require some portion of the risk and loss to be allocated to Plaintiff. Attaching tort-based elements to contract-breach cases, without also considering in the contract-damages analysis the contributing conduct of the non-breaching party or, stated differently, without considering that the breaching party's nonperformance may have only contributed in part to the damages, can, and in the present case did, lead to an unacceptable disproportionate result. That is, the nonperformance of Defendant in failing to give advance notice constituted both a breach of contract and negligence resulting in identical damages yet 100% of the damages was awarded against Defendant in contract, but only 20% of the damages was awarded against Defendant in negligence.

**{69}**    Plaintiff has argued that the parties could or should have contemplated the mere fact of loss in order to support Defendant's responsibility for the loss that ultimately occurred. Plaintiff equates its "reasonable foreseeability" concept with "contemplation of the parties." This means *both* parties, as reflected by the following colloquy in oral argument before this Court.

> Counsel for Plaintiff:   Did the parties contemplate that the wrongful termination of electricity could hurt the integrity of this facility in the commercial activities that were going on?   Absolutely your honor, absolutely.
>
> Judge:  Both parties?
>
> Counsel for Plaintiff:  Both parties.  Absolutely.

Thus, if liability exists because the fact of loss or type of harm was contemplated by both parties, logic requires the conclusion that if the fact of loss or type of harm was in the contemplation of Defendant, Plaintiff must be held equally to have contemplated and thus have foreseen the same fact of loss or type of harm. Plaintiff therefore cannot overlook the fact that it should have taken precautions in regard to both causing a fire to start when it knew the electricity was disconnected and assuring that it would immediately have available various alternative sources of electricity and sources of water to quench a fire once it started. As shown by the district court's findings, Plaintiff negligently failed in both respects. That failure is the type of avoidance or mitigation that is contemplated in a contract setting, as indicated in the Restatement's Section 351(3) disproportionality provision and in Section 55-2-715(2)(a)'s prevention by "cover or otherwise." *Outboard Marine* also opens the common law door to such relief. *See* 106 F.3d at 185-86.

{70}     Plaintiff, of course, strongly argues that the doctrine of comparative fault is a tort doctrine that does not apply in contract cases. *See, e.g.*, *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 23, 127 N.M. 1, 976 P.2d 1; *Key v. Chrysler Motors Corp.*, 119 N.M. 267, 275, 889 P.2d 875, 883 (Ct. App. 1995), *rev'd on other grounds*, 1996-NMSC-038, 121 N.M. 764, 918 P.2d 350. We are not convinced, however, that this general rule should apply under circumstances, like here, where the contract standard is replaced by a tort standard, to rule out application of concepts of avoidable consequences or mitigation or otherwise sharing responsibility for damages under the rationale underlying comparative fault. The circumstances here are not similar to those in the cases that set out the comparative fault rule. And the cases that state the rule cannot be read to say that the rule must be applied in all circumstances. Plaintiff provides no persuasive underlying rationale as to why the foregoing rule necessarily must apply in the present case or as to why its actions and failures to act should not be considered in limiting damages.

{71}     We do not quarrel with the general principles Plaintiff argues that contract damages are based on "assumpsit" or a promise, making the defendant strictly liable, whereas negligence damages are based on wrongdoing. But we do not accept this formality and distinction under the circumstances here to rationalize a disproportionate recovery. We see no sound reason why an approach guided by those in Restatement Section 351(3), Section 55-2-715(2)(a), and *Outboard Marine* could not and should not have been pursued to fairly and rationally allocate or apportion the damages in this case awarded in both contract and negligence. This case as it was decided by the district court in both contract and negligence based on identical conduct and damages reasonably called for allocation of consequential damages, upon the just notion that a nonperforming party ought not to be saddled with damages it did not cause through its breach and that can be allocated to the conduct of the other party with reasonable certainty. Thus, were we to hold that Plaintiff's tort-based standard was properly applied to recovery of consequential damages in contract, we would disallow the award of $21 million of contract damages based on the district court's failure to address allocation or apportionment of damages.

## II.     Award of Punitive Damages

### A.     The Background

29

**{72}** The court awarded $100,000 in punitive damages against Defendant "for its willful, malicious, wanton, and reckless conduct in impeding firefighters with the threat of liability in energizing the electricity." In that context only, the court determined that Defendant's "conduct was a breach of its duty under its contract with [Plaintiff]" and that the conduct "constituted willful, malicious, wanton[,] and reckless negligent behavior." These statements in the amended judgment were based on conclusion of law number 7 of the district court, which stated:

> This [c]ourt further finds that the conduct of Defendant . . . was [willful], reckless, wanton[,] and in bad faith entitling Plaintiff to punitive damages when it threatened [the fire chief] with "liability" twice before turning on the power to the facility after [the fire chief] requested the assistance of [Defendant] to reenergize the facility to allow the firefighters access to more water to fight the fire.

The basis for the foregoing conclusion and for the punitive damages awards in both contract and negligence appears to be contained in the following evidentiary finding of fact that recites two instances in a conversation in which the fire chief was twice informed that power would not be turned on unless he assumed liability.

> Within 15 to 20 minutes on scene, [the fire chief] uses his cell phone and calls dispatch and requests that the power be turned back on. He is called back and told that [Defendant] cannot turn the power back on unless you assume liability. [The fire chief] then asked dispatch to call [Defendant] back and ask what liability he had to assume. Dispatch called [the fire chief] back and told him again that [Defendant] would not turn power back on unless you assume[] liability. [The fire chief] did not know what the "hell" they were talking about with "assuming liability[,]" so he went to plan B. He went to plan B because they wouldn't turn the power back on.

The record evidence supporting this finding was the fire chief's testimony, which was as follows.

> Q. Okay. Now, you said next you went to step two, when you determined that there was no electricity to the pump, what's that?
>
> A. Step two, I was in contact with the 911 dispatch. I advised them that I had already set up my scene and most of my communications would be on Channel 1, which is a fire-tech channel; and my cell phone for incoming calls to me would be [799-XXX4] and my outgoing would be on [799-XXX5]; and at the same time, I asked if we could have [Defendant] turn on the power to the well.
>
> Q. Okay. Now, did you receive a response to that request?

A.    Yes, sir. They called me back and said [Defendant] cannot turn the power on unless you assume the liability. And I asked the dispatcher, . . . I said, . . . what is the liability that I would accept or take responsibility of? She said, I don't know. I said, well, find out. What are they telling me that I would assume liability [for]? So she called me back and she said, they won't turn it on, [unless] you'd . . . assume the liability. And I said, well, I don't know what the hell they're talking about, so I'm going to go on with my other [p]lan B, if they can't turn on the power and give me water.

**{73}**    Nothing in the record directly ties any particular employee of Defendant to the statements to the 911 dispatch operator. The parties appear to assume a connection between (1) the person communicating with the 911 dispatch operator as discussed by the fire chief and (2) a person with whom Defendant's foreman lineman, Paul Chavez, spoke as reflected in a three-way, tape-recorded conversation on September 9 that included a person assumed to be a dispatch operator of Defendant, Greg Brazil, who was a supervisor, and Chavez. The district court's conclusions of law numbered 6 and 7, which discuss the threat of liability, are the only conclusions that tie Defendant's conduct to punitive damages. Chavez had been called out to disconnect the electricity at Sunnyland on September 8 before the fire occurred on September 9. He testified that he received a dispatch to de-energize the power on September 9. A co-worker, on the other hand, testified that he and Chavez were told that they were to re-energize the facility. In the tape-recorded conversation referred to earlier, after introductory statements, Chavez stated: "Okay Moriarty. You advised that we are going to throw the power out here to the [g]reenhouse and there is a heck of a fire and I don't know what it is going to do when I send these jacks in but I will not be held responsible." The dispatch operator with whom Chavez was speaking got supervisor Brazil on the line immediately following Chavez's statement and the operator stated to Brazil that she "did let [Chavez] know [that Plaintiff] had paid in full and to reconnect [the electricity] but [Chavez] is concerned about that." The operator asked Brazil whether Chavez should reconnect, and the response was that Chavez "ought to go with his judgment," after which Chavez stated, "I just don't want to be responsible if something happens." Supervisor Brazil then stated that Defendant's "policy has always been we don't hook up the service after a fire until it has been checked out" and further that "[i]f they want to go with [another supervisor, Tutor Davis] . . . and he wants to go ahead . . . that's up to him. But that has always been our policy." Chavez's follow up before the recording ended was inaudible except for a statement that "[w]e are going to reconnect the irrigation valve and the residence."

**{74}**    Various observations result from the record. First, no direct link exists between Chavez or anyone else and the person who spoke to the 911 dispatch operator. The court in fact found that "Chavez never spoke to any firefighter or police about the request to turn the power back on." Second, the person who spoke to the 911 dispatch operator was not specifically identified nor was that person's authority identified. Third, there exists nothing in the record from which a reasonable inference can be drawn that any employee of Defendant with authority to do so made any threat to the 911 dispatch operator or the fire chief with respect to liability.

31

## B.     Standard of Review

{75}    Defendant contends that there existed no factual or legal basis for the district court's award of punitive damages related to any breach of contract or negligence claim. Defendant asserts that the court reviews factual questions under a substantial evidence standard and the application of law to the facts de novo, citing *New Mexico Banquest Investors Corp. v. Peters Corp.*, 2007-NMCA-065, ¶ 29, 141 N.M. 632, 159 P.3d 1117, *aff'd*, 2008-NMSC-039, 144 N.M. 434, 188 P.3d 1185, and *State v. Baca*, 2004-NMCA-049, ¶ 11, 135 N.M. 490, 90 P.3d 509. Plaintiff contends that, when punitive damages are not awarded, the standard is abuse of discretion; whereas, when punitive damages are awarded, the standard is substantial evidence, but the question of reasonableness is reviewed de novo. Plaintiff also cites *Peters Corp.*, 2008-NMSC-039, ¶ 43, and in addition cites *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 36, 140 N.M. 478, 143 P.3d 717. The issues before us on punitive damages do not involve a denial of punitive damages or the reasonableness of a punitive damages award. The issues in our view are purely legal ones, which we review de novo. *Littell v. Allstate Ins. Co.*, 2008-NMCA-012, ¶ 59, 143 N.M. 506, 177 P.3d 1080.

## C.     The Parties' Arguments

{76}    The nature of the parties' arguments sets the stage for our analysis and determination of the punitive damages awards. Defendant asserts error because there were no contractual provisions regarding Defendant's obligation if a fire occurred through no fault of its own, and because the district court nowhere determined that Defendant breached any specific provision of the contract in regard to its post-fire conduct. Defendant argues that the only provisions at issue were those relating to the contractual requirements for advance notice of a disconnect, and the only breach found by the district court to have caused Plaintiff's damages was Defendant's failure to provide advance notice of the disconnect. Thus, according to Defendant, punitive damages could not have been based on any post-fire conduct not found to have been in breach of any particular contractual provision and not found to have resulted in any damages to Plaintiff.

{77}    Defendant also asserts error on the ground that Defendant is a corporation and no evidence was presented nor any finding entered to support the court's determination of liability of Defendant based on the statements made by the employee involved. Defendant argues that none of the three possible proof requirements for such liability, as stated in *Chavarria*, were found or met. Those requirements are:

> A corporation may be held liable for punitive damages for the misconduct of its employees if: (1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages[]; (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages[]; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages[.]

32

*Chavarria*, 2006-NMSC-046, ¶ 21 (citations omitted); *see* UJI 13-1827 NMRA (setting out proof requirements for various liability for punitive damages and requiring that a jury find that the conduct of an agent or employee at issue can be properly attributed vicariously to the corporation before an award of punitive damages may be made).

{78}  Defendant points out that Plaintiff filed requested findings of fact on the first two of these three *Chavarria* requirements, namely, managerial capacity and authority or ratification, and that the court did not adopt either of them, thereby constituting a refusal of those requested findings. *See W. Bank v. Franklin Dev. Corp.*, 111 N.M. 259, 260, 804 P.2d 1078, 1079 (1991) ("The refusal by the court to accept a requested finding is regarded on appeal as a finding against the party bearing the burden of proof on the issue at trial."). Plaintiff's requested findings of fact that were not adopted by the court were:

> 270.  This [c]ourt further finds that . . . Chavez was acting in the scope of his employment by [Defendant] and had sufficient discretionary or policy-making authority to speak and act for [Defendant] with regard to the conduct at issue, independently of higher authority.
>
> . . . .
>
> 272.  This [c]ourt further finds that [Defendant] authorized, participated in and/or ratified the conduct of . . . Chavez when he refused to approach the firefighters on scene to offer assistance and when he refused the pleas of [the fire chief] for the power to be reenergized to allow access to water to fight the fire.

{79}  Refusal by a court to accept a requested finding is regarded on appeal as finding against the party bearing the burden of proof on the issue at trial. *W. Bank*, 119 N.M. at 260, 804 P.2d at 1079; *Empire W. Cos. v. Albuquerque Testing Labs., Inc.*, 110 N.M. 790, 794, 800 P.2d 725, 729 (1990); *Worthey v. Sedillo Title Guar., Inc.*, 85 N.M. 339, 342, 512 P.2d 667, 670 (1973) (refusing the request of a party to draw an inference from the record, and stating that "[t]he failure of the trial court to make a finding on this material issue of fact would ordinarily be regarded on appeal as a finding against the [party], upon whom rested the burden of proof thereon"); *Foremost Foods Co. v. Slade*, 80 N.M. 658, 659, 459 P.2d 457, 458 (1969) ("The failure to make specific findings of fact is regarded as a finding against a party having the burden of establishing that fact.").

{80}  Plaintiff argues that the district court could reasonably determine that Defendant had the requisite culpable mental state based on the aggregate of Defendant's employees' actions. *See Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 270, 881 P.2d 11, 15 (1994) (stating that the conduct of employees is not to be compartmentalized but the court should view "the actions of the employees in the aggregate to determine whether [the corporation] had the requisite culpable mental state because of the cumulative conduct of the employees"). Plaintiff argues that "[t]he record is replete with evidence of a corporate attitude of active and affirmative disregard for [Plaintiff's] well-being and its rights under the contract." Plaintiff also advances a theory that the refusal to reconnect "was a continuation of the

wrongful conduct that had resulted in disconnecting that power in the first place." Finally, stating that UJI 13-1827 "does not tell jurors that the punitive damages must arise from the same breach that gives rise to compensatory damages," Plaintiff argues that "[s]uch a requirement would be inconsistent with the underlying purposes of punitive damages" and that in New Mexico, punitive damages "are based on 'the quality of the conduct constituting the breach itself,'" taking the quote from *Romero v. Mervyn's*, 109 N.M. 249, 257, 784 P.2d 992, 1000 (1989).

## D. The Court's Punitive Damages Awards Cannot Stand

### 1. The Award Arising From Contract

**{81}** The only circumstance or conduct identified by the district court in its findings of fact and conclusions of law in the present case to cause the consequential damages awarded was the lack of advance notice of the disconnect before the fire occurred. The court, however, expressly determined that Defendant's pre-fire conduct did not give rise to punitive damages. The conduct on which the punitive damages were awarded (1) occurred after the fire started, (2) consisted of the liability threat to the fire chief, and (3) was not found by the court to have constituted a breach of any particular provision of the contract. The court did not in any finding of fact or conclusion of law determine that any conduct related to reconnecting or not reconnecting power after the fire occurred caused Plaintiff's damages. Failure of the district court to make such a finding of a material issue of fact is regarded as a finding against the party having the burden of establishing the fact. *Worthey*, 85 N.M. at 342, 512 P.2d at 670; *Foremost Foods*, 80 N.M. at 659, 459 P.2d at 458. Nor did Plaintiff request such a finding. The conduct on which the court awarded punitive damages based on breach of contract was not the same conduct for which the court awarded consequential damages. Moreover, the reasons for the decision to disconnect were entirely different than the reasons for the decision not to reconnect, and the actors were different. For the foregoing reasons, and also because we have held that Plaintiff's consequential damages in contract are not recoverable, the punitive damages award is not sustainable insofar as it was based on Defendant's breach of contract. *See Peters Corp.*, 2008-NMSC-039, ¶¶ 42-43 (rejecting an argument that the court was required to award punitive damages regardless of whether the breach caused any harm); *Gonzales v. Sansoy*, 103 N.M. 127, 129, 703 P.2d 904, 906 (Ct. App. 1984) ("The conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed." (internal quotation marks and citation omitted)).

**{82}** Plaintiff nevertheless argues that we should hold that failure to reconnect was inherently a breach of contract, that it is implicit that restoration of electricity is an integral part of the contract, and that this Court "would have to be blind . . . to the reality not to view [the failure to reconnect] as a breach of contract" or "to view that the damages . . . flow[ed] from that breach of contract." We reject these arguments. This trial was lengthy. The court's findings of fact were detailed and extensive. Plaintiff took the opportunity before the initial judgment was entered to file requested findings of fact and conclusions of law. Plaintiff had an opportunity after the court entered its findings of fact, conclusions of law, and initial judgment, to argue its positions and express any concerns about deficiencies in

34

the findings of fact, conclusions of law, and judgment that might subject the award to attack. Plaintiff did not seek any clarification or ask the court to correct any deficiencies in the amended judgment. We gauge the factual and legal bases for the district court's breach of contract and punitive damages determinations based on its supportable findings of fact and supportable conclusions of law. We are not prepared to speculate on what the court might have factually determined to support a conclusion, nor under the circumstances will we speculate on what the court must have implicitly determined.

## 2.        The Award Against the Corporation

{83}    In regard to both contract and negligence, it was incumbent on the district court to enter a finding of fact showing that at least one of the three requirements in *Chavarria* was met supporting a conclusion of law of corporate culpability. *See* 2006-NMSC-046, ¶ 21. There exists no such finding of fact, and we regard that failure as a finding against Plaintiff. *Worthey*, 85 N.M. at 342, 512 P.2d at 670; *Foremost Foods*, 80 N.M. at 659, 459 P.2d at 458. We are not presented with any evidence showing Defendant's ratification, authorization, or approval of any conduct or statements by any employee. Nor are we presented with any findings of fact or evidence that the employee who may have stated something to the 911 dispatch operator, as reported by the operator to the fire chief, was employed in a managerial capacity. There are no findings related to what such unidentified employee was authorized to say or related to the critical factor of "the degree of discretion the employee[] possess[ed] in making decisions that will ultimately determine corporate policy[,]" including "discretion regarding both what is done and how it is done." *Albuquerque Concrete Coring Co. v. Pan Am World Servs., Inc.*, 118 N.M. 140, 145, 879 P.2d 772, 777 (1994).

{84}    While the court appears to have been persuaded that some employee's statement or conduct showed a culpable mental state through a threat of liability stated to a 911 dispatch operator, more than this vague conclusion is required in order to place liability for punitive damages on the corporation. At least one of the three *Chavarria* requirements must be met. The court did not adopt and therefore rejected Plaintiff's requested findings on the first two *Chavarria* elements. *W. Bank*, 111 N.M. at 260, 804 P.2d at 1079; *Empire W.*, 110 N.M. at 794, 800 P.2d at 729. We cannot affirm the punitive damages award absent a finding by the district court of a *Chavarria* element to support its conclusion that Defendant, a corporation, was itself culpable and liable in punitive damages based on the action or statement of a particular type of employee. *See Worthey*, 85 N.M. at 342, 512 P.2d at 670 ("Even if there were evidence from which [an] inference might reasonably be drawn, it is not for us to draw such an inference. . . . The failure of the trial court to make a finding on this material issue of fact would ordinarily be regarded on appeal as a finding against the [party], upon whom rested the burden of proof thereon."); *Sunwest Bank of Albuquerque, N.A. v. Daskalos*, 120 N.M. 637, 639, 904 P.2d 1062, 1064 (Ct. App. 1995) (observing that the district court made no findings of fact regarding the conduct of the plaintiff and concluding that "[i]t would be inappropriate for this Court to affirm based on findings of fact the trial court did not make"). We note, further, that we are not made aware by Plaintiff where it raised in the district court or tried this case on the theory it now advances that the aggregate or "cumulative effects"

35

of the conduct of one employee of Defendant over the course of all events permitted a determination of corporate culpability.

## III.   The Issue of Reasonable Certainty in Ascertaining Lost Profits

{85}   This issue relates to Plaintiff's expert Dr. Bill Bauerle's estimate of Plaintiff's future beefsteak tomato production level or crop yield for an approximate twelve-month period. Production level and crop yield mean the same thing. The parties and witnesses use these words interchangeably. We will use "production level" except where "crop yield" appears in a quote.

{86}   Defendant claims there is insufficient evidence to support the amount of the award of lost profits because Dr. Bauerle's opinion on Plaintiff's estimated future production level was speculative and lacked reasonable certainty, was overwhelmingly contradicted by other evidence, and was unworthy of belief. Under our sufficiency of evidence standard of review, we examine whether a determination is supported by "such relevant evidence that a reasonable mind would find adequate to support a conclusion[.]" *Weststar Mortg. Corp. v. Jackson*, 2003-NMSC-002, ¶ 8, 133 N.M. 114, 61 P.3d 823 (internal quotation marks and citation omitted). An award of damages must be based on reasonable certainty. *Rael v. F & S Co.*, 94 N.M. 507, 511, 612 P.2d 1318, 1322 (Ct. App. 1979); *cf. State v. Downey*, 2008-NMSC-061, ¶ 36, 145 N.M. 232, 195 P.3d 1244 (requiring the expert witness "to pinpoint to a reasonable certainty the time at which [the d]efendant had begun or ceased drinking [in] applying the science of retrograde extrapolation" and concluding that the expert's factual assumptions were unsupported by the evidence).

### A.   The District Court's Findings of Fact

{87}   We begin with the district court's findings of fact relating to its award of damages for estimated future lost profits. The court's award of those lost profits was derived from the testimony of Dr. Bauerle as to Plaintiff's estimated future production level had the fire not occurred. The court found that Dr. Bauerle testified that he was knowledgeable in hydrophonic technology, and had acted as a consultant for growers. The court also found that Dr. Bauerle had performed over a hundred crop-loss evaluations[6] and that Dr. Bauerle concluded that he had the knowledge and scientific background to determine a loss of such nature. The court further found that Defendant's witness on crop loss, Kenneth Gerhart, had admitted "based upon the literature associated with the tomato varieties used, that Dr. Bauerle['s] crop yield calculations are more accurate than his."

{88}   The court closed its findings in regard to crop loss by finding that Dr. Bauerle concluded and reported that "the actual loss" during the relevant period of time totaled

---

[6] Dr. Bauerle testified that he had done "in excess of [100] crop loss assessments, . . . 60 crop loss assessments in Leamington[, Ontario] when they had the hail [in 1985], through . . . the insurance company . . . [s]o that particular . . . site was 60 appraisals, and from that and after that, I did upwards of over [100] past appraisals for greenhouse[s], not only in vegetables, but in flowers and things located in the greenhouse."

$21,629,127, excluding certain expenses. Apparently based on Dr. Bauerle's testimony and report, and on testimony from another witness as to expenses and savings associated with Dr. Bauerle's testimony and report, the court found that saved expenses had to be deducted from Dr. Bauerle's loss determination and that the net total of Plaintiff's estimated future crop loss was $13,704,828. The court's sole conclusion of law pertaining to crop loss was that the net total crop loss amount was $13,704,828.

## B.    Dr. Bauerle's Presentation

{89}    Dr. Bauerle assessed Plaintiff's future crop loss for the period November 21, 2003, when Plaintiff's crop would have begun harvesting, to December 31, 2004, when another company took over the property. Dr. Bauerle gave what he considered to be a conservative production level estimate of 75 pounds per plant per year which equals 95 kg per square meter per year. He supported this estimate after considering the several factors we discuss later in this opinion. Defendant attacks the court's award on the ground that Dr. Bauerle's estimated production level on which he calculated lost profits was almost double the United States Department of Agriculture's (USDA's) range for tomato greenhouses in Southwestern United States, a source acknowledged as authoritative by Dr. Bauerle, and further that the undisputed evidence indicated that Dr. Bauerle's estimated production level had not been achieved by any other known greenhouse. Defendant points to the USDA's report as indicating that facilities similar to Plaintiff's were producing average yields of between 50 and 53.4 kilograms per square meter and that the average production level for the southwestern United States was 53 kilograms per square meter. The district court actually entered findings on the production goals of greenhouses in Colorado, of Agstar, and of Plaintiff, finding that they "had goals of production of 50 kg per square meter per year growing beefsteak tomatoes" and that Plaintiff, "in its own financial plan, projected production levels of 57 kg per square meter per year."

{90}    Defendant finds further fault with Dr. Bauerle's estimates because he did not take into consideration real world factors such as disease, insects, intercropping, the skill of the grower, equipment failure, and the past production levels, equipment failures, and significant losses of the Agstar operation before Plaintiff took ownership. Defendant also disputes the court's finding regarding Mr. Gerhart's view of Dr. Bauerle's estimates, arguing that Mr. Gerhart disputed those estimates and that the court's finding was erroneous because it misconstrued Mr. Gerhart's testimony.

{91}    Plaintiff has a different view. Plaintiff shows that Dr. Bauerle estimated that Plaintiff would put in 110,000 plants, each plant having 2 stems, the growing cycle would be between 8 ½ and 10 days for fully mature fruit, and 4 pounds of fruit could be harvested from each plant 40 times a year for a total of 160 pounds per plant per year, or 80 pounds per stem per year, which Dr. Bauerle rounded to 75 pounds per plant stem per year. Based on this estimate, Dr. Bauerle applied market prices to arrive at a gross estimated tomato crop loss of $21,629,127 for the period of November 21, 2003, through December 31, 2004.

{92}    Plaintiff points to several other aspects of Dr. Bauerle's testimony, the combination of which, Plaintiff contends, supported Dr. Bauerle's estimated future production level: the

37

height of the greenhouse permitting plants to grow taller with improved yields; the varieties of beefsteak tomatoes Plaintiff intended to grow and their aggressive root systems; the availability and good quality of the water; the irrigation and fertilizer systems and the quality of the boilers; a ventilation system that would bring $CO_2$ into the greenhouse and the presence of adequate $CO_2$ promoting photosynthesis; excellent light intensities, which facilitates year-round growing; the quality of the computer system planned for the greenhouse; the New Mexico climate; the practice of pruning resulting in increased fruit weight; and Plaintiff's intent to intercrop, permitting year-round harvesting. Plaintiff discusses Dr. Bauerle's explanations as to why he did not consider any greenhouse's past experience, why he did not consider past history to be a good indicator of future production level, and that Dr. Bauerle opined that there was a lack of data on greenhouse operations in the Southwest.

{93}     Dr. Bauerle did not consider greenhouse production history to be a good indicator for future production capabilities because any particular year's production level could be adversely affected by an insect or virus disease. He stated that his projections were based on his crop-loss assessments, not a history of growing tomatoes in the Southwest. In his assessments, he used the current-year crop from the period of loss. In his view, his crop-loss assessments were a more valid way to evaluate production potential. Dr. Bauerle acknowledged that Defendant's USDA source was "the first exhaustive study done on tomato production in North America" and was "the authoritative source for information by hydroponic greenhouse operations and even field operations." However, he questioned the utility of its use of greenhouse production averages because some greenhouses are large and some are small, and "[y]ou can't average a greenhouse."

## C.     Lack of Reasonable Certainty and Thus Lack of Sufficiency

{94}     One has to seriously question the reasonable certainty of Dr. Bauerle's  estimate of Plaintiff's future production level for the approximate twelve-month period, November 21, 2003, to December 31, 2004. His estimate was not based on any reported, authoritative, or actual production-level statistic. Nor was his estimate based on any experience of Plaintiff or of Agstar. Plaintiff was a new operation. Agstar actually failed, with losses. Dr. Bauerle's production-level estimate in kilograms was nearly twice that (95 kg versus 50-53 kg) of the actual production-level averages presented to the court in the USDA reports and of Plaintiff's own goal. His estimate of future production level was based on what he learned from his crop-loss assessments in Leamington, Ontario, on assumptions that Plaintiff would be a high-quality operator and would use a skilled grower, and on his opinion that Plaintiff's high-quality technology and the procedures it would implement would produce the increased yield. Dr. Bauerle testified regarding a greenhouse called Eurofresh in Arizona, but we see nothing to indicate that he relied on Eurofresh's production level experience in making his estimate. Plaintiff does not show or argue that Dr. Bauerle relied on Eurofresh's production level in arriving at his own production-level estimate for Plaintiff. Dr. Bauerle agreed with the fact that "[t]omatoes on the vine at Eurofresh would not give [him] any comparable data to analyze as to what [he] would expect for production to be in Estancia, New Mexico" for beefsteak tomatoes. He did not "think that cluster tomatoes in Eurofresh's facility are comparable to beefsteak tomatoes here[.]"   He had not located

38

information as to production levels for beefsteak tomatoes in the United States. Plaintiff does not show or argue that Dr. Bauerle relied on the production level of any greenhouse similar to Plaintiff's facility. Dr. Bauerle agreed that there was "a steep learning curve of several years usually associated with achieving top production levels." He acknowledged as authoritative the USDA material which reported that the average United States and Canadian greenhouse yields frequently approach a number that converted to 50 to 53.4 kg per square meter with a high of 70 kg per square meter. Dr. Bauerle did not account for any possibility of conditions that could adversely affect the twelve months of Plaintiff's anticipated production such as disease, insects, and equipment failure; yet he rejected past history as an indicator because insects and disease could adversely affect production levels in any particular year.

{95}    While Dr. Bauerle's evidence presents what may have been some evidence in support of his production-level estimate, it is difficult to see how the evidence rose to the level of reasonable certainty as to production levels. That production-level estimate is critical to a future crop-loss estimate in a particular dollar amount, and the estimate had to be established with reasonable certainty. Dr. Bauerle's opinion was weighted much too heavily on hypothetical optimum-quality performance backed by no actual production-level experience of Plaintiff or by any historical, actual, or average production level of other, similar operations.

{96}    In *Rael*, this Court determined that the plaintiff failed to justify use of an instruction on future pain and suffering where the plaintiff's expert failed "to present some reasonably certain proof as to the severity and duration with which they would occur." 94 N.M. at 512, 612 P.2d at 1323. The Court determined lack of reasonable certainty from the following standard.

> Damages based on surmise, conjecture[,] or speculation cannot be sustained. Damages must be proved with reasonable certainty. There is no exception to the above rule for future damages. The ultimate fact which the plaintiff has the burden of proving is future damages reasonably certain to occur as a result of the original injury.

*Id.* at 511, 612 P.2d at 1322 (citations omitted). "[T]he rule allowing recovery for lost profits requires that the plaintiff prove such loss with a reasonable degree of certainty through use of the best evidence available." *Albin Elevator Co. v. Pavlica*, 649 P.2d 187, 191 (Wyo. 1982).

{97}    While circumstances might exist under which future lost profits can be recovered by a new operation that has not yet planted its first crop, we think it important to quote our Supreme Court's approval of the Georgia Supreme Court's statement that "[i]f anything is speculative, remote, and contingent, it is the net income from a business never begun." *C.W. Kettering Mercantile Co. v. Sheppard*, 19 N.M. 330, 334, 142 P. 1128, 1129 (1914) (internal quotation marks and citation omitted). The Court in *Sheppard* followed with the statement, "[i]t is therefore our opinion that anticipated or expected profits from a business prior to its establishment is an improper element in the measure of damages, because it cannot be

proved that they would have been realized." *Id.*; *see Re/Max of Georgia, Inc. v. Real Estate Group on Peachtree, Inc.*, 412 S.E.2d 543, 546 (Ga. Ct. App. 1991) ("Although lost profits may be recoverable where a business is well established and reasonable data exist for their ascertainment, the lost profits of a new business are generally too speculative for recovery[.]"); *Center Ridge Ganley, Inc. v. Stinn*, 594 N.E.2d 1064, 1070 (Ohio Ct. App. 1991) (holding that because the plaintiff was embarking on a new business venture, its attempt to calculate what its lost profits might have been was speculative and not based on reasonable certainty, stating "[a] new business cannot recover lost profits damages"); *see also Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995) (stating that, under Illinois law, "a new business generally has no right to recover lost profits" and that "[t]his element of damages is recoverable only if the business was previously established"); *White v. Oregon Horticultural Supply, Inc.*, 594 P.2d 1321, 1323 (Or. Ct. App. 1979) (addressing the sufficiency of evidence of crop yield of a hydroponic tomato farm and holding that the experience of production was insufficient to establish lost profits, stating that "[s]atisfying the test of reasonable certainty required for proof of lost profits is particularly difficult where the business is short-lived").

{98}   At the very least, if a new greenhouse operation with no production experience seeks recovery of lost profits, that business should have to present some credible evidence of production levels in the range of its estimate having been reached by similar greenhouses. *See Albin Elevator*, 649 P.2d at 192-93 (indicating that while the plaintiff did not have extensive experience in planting spring wheat on his farm, and because the farmer's income from plantings was dependent on many variables, and thus "every year's experience takes on the characteristics of a new venture," the plaintiff might have been able to rely on the experience of a neighboring farmer in attempting to prove lost profits were it not for other critical failures in proof); *see also Gibbs Patrick Farms, Inc. v. R.D. Clifton Co.*, 2008 WL 2223255, at *1 (M.D. Ga. 2008) (order) (indicating that, under Georgia law, lost profits must be proved to a reasonable certainty and that expected crop production levels might be shown based on "evidence of the same crop grown on nearby land with similar soil conditions").

{99}   To reach the conclusion of future lost profits reached by Dr. Bauerle, the fact finder had to conclude that Dr. Bauerle's production-level estimate was reasonably certain; otherwise the evidence was insufficient to support the conclusion as to the amount of future lost profits. We fail to see how a reasonable mind could reach that conclusion of reasonable certainty in this case based on Dr. Bauerle's testimony and report. *Merriam-Webster's Collegiate Dictionary* 187 (10th ed. 1996) defines "certainty" as, among other things, "the quality or state of being certain esp. on the basis of evidence." Adding "reasonable" to "certainty" must connote a standard more stringent than likelihood or probability, which are words that are well known in proof analyses, but are not used in the test for determining future lost profits of a new business. Plaintiff failed to eliminate too many uncertainties. We hold that Dr. Bauerle's estimate of future lost profits based on his opinion of a 95 kg per square meter production level lacked reasonable certainty, and was therefore not supported by sufficient evidence, and the district court erred in adopting Dr. Bauerle's estimated lost profits figure.

40

**{100}** Plaintiff is entitled on its negligence claim to recover lost future profits that can be ascertained with reasonable certainty. Defendant has argued that Plaintiff's own production-level estimate was 57 kilograms per square meter per year. Defendant has not indicated that this estimate was unreasonable or uncertain. Defendant in fact defended against an unreasonable, uncertain production level by proving that facilities similar to Plaintiff's were producing average yields between 50 and 53.4 kilograms per square meter and that the average for the southwest region was 53 kilograms. Based on these figures and on the district court's apparent but unsupported view that a production level of 95 kilograms was reasonable, we think it reasonable for this Court to determine on appeal that a reasonably certain production-level estimate for Plaintiff was 53.4 kilograms per square meter. If the parties are unable to arrive at the correct amount of damages for lost profits from the 53.4 kilograms figure, they are to present the issue of the calculation of the damages amount to the district court to decide.

## PLAINTIFF'S CROSS-APPEAL—DISCUSSION

**{101}** Plaintiff asserts on cross-appeal that (1) the district court erred in not awarding it post-judgment interest at the rate of 15% per annum on contract damages as provided in NMSA 1978, Section 56-8-4(A)(2) (1993) (amended 2004); (2) the district court abused its discretion in not awarding Plaintiff pre-judgment interest; and (3) the district court erred in awarding Defendant a set-off on account of a subrogation lien that Defendant had purchased from Plaintiff's casualty insurer. We hold that the court did not abuse its discretion or otherwise err.

## I.     Post-Judgment Interest

**{102}** Section 56-8-4(A)(2) states:

> Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of [8.75%] per year, unless:
>
> . . .
>
> (2) the judgment is based on tortious conduct, bad faith or intentional or willful acts, in which case interest shall be computed at the rate of [15%].

"When a judgment is based on tortious conduct, bad faith, or a finding that the defendant acted intentionally or willfully, a court must award interest at the higher rate of 15 percent." *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 55, 131 N.M. 100, 33 P.3d 651. We review whether a defendant acted in a manner to warrant the increased penalty for abuse of discretion. *Id.* ¶¶ 55, 62. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

41

**{103}** Plaintiff argues that Defendant intentionally and willfully breached its contract with Plaintiff in disconnecting the electricity without notice and intentionally, willfully, and maliciously breached its contract with Plaintiff in refusing to reconnect power even though Defendant knew that the fire chief needed electricity to get at available water to fight the fire. In short, Plaintiff asserts that there were three willful contract breaches: One, the disconnection of electricity; two, the failure to give proper advance notice of the disconnection; and, three, the refusal to reconnect the electricity. Thus, Plaintiff argues, the court was required under Section 56-8-4(A)(2) to award 15% interest on the judgment.

**{104}** Plaintiff builds its argument on the district court's findings of fact relating to the events that occurred both before and after the fire occurred; on the court's conclusion of law finding that Defendant's conduct was "[willful], reckless, wanton[,] and in bad faith entitling Plaintiff to punitive damages" when Defendant threatened the fire chief with "liability"; and on the court's amended judgment assessing punitive damages against Defendant based on that threat and stating that the conduct "was a breach of its duty under its contract with [Plaintiff]."

**{105}** Plaintiff's argument reaches beyond what the court determined. The court specifically held that "[Defendant] did not act maliciously, [willfully], wantonly, fraudulently or in bad faith toward [Plaintiff] prior to the fire thereby barring any claims for punitive damages for conduct prior to the fire." Furthermore, the court did not find any pre-fire breach of contract which caused Plaintiff's damages other than that Defendant "fail[ed] to provide advance notice of the disconnect of electrical service to [Plaintiff]." And, as discussed earlier in this opinion, the court did not determine in its findings, conclusions, or amended judgment that Defendant's threat to the fire chief on which the court awarded punitive damages was a breach of any particular contract provision, or that to the extent it was a breach of duty under the contract, it caused any damages to Plaintiff.

**{106}** It is clear to us that the court's determination of willful and intentional conduct on Defendant's part pertained solely to what the court found to be a post-fire liability threat and that it made the determination regarding that conduct solely for the purpose of awarding punitive damages. In fact, the court expressly determined that post-judgment interest would accrue at the rate of 8.75% on damages based on breach of contract.

**{107}** We hold that the court did not abuse its discretion. The judgment entered in this case on the basis of breach of contract was not based on culpable conduct requiring a 15% interest award. Furthermore, and also dispositive is our holding that Defendant is not liable in contract for any of the consequential damages that resulted from the fire.

## II.    Prejudgment Interest

**{108}** The district court determined that no prejudgment interest would attach to its judgments in contract and negligence. Section 56-8-4(B) states:

42

Unless the judgment is based on unpaid child support, the court in its discretion may allow interest of up to [10%] from the date the complaint is served upon the defendant after considering, among other things:

(1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and

(2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff.

"Whether to award prejudgment interest is a decision left to the sound discretion of the trial court, and we will reverse only for an abuse of that discretion." *Abeita v. N. Rio Arriba Elec. Coop.*, 1997-NMCA-097, ¶ 44, 124 N.M. 97, 946 P.2d 1108 (citation omitted).

{109}   Plaintiff argues several rationales to support its position on appeal that the court abused its discretion in not awarding prejudgment interest. Plaintiff argues entitlement to prejudgment interest based on the ground that Defendant rebuffed reasonable settlement offers, based on equitable grounds, and based on the ground that such an award would have advanced the objectives of Section 56-8-4(B). Plaintiff also argues entitlement because New Mexico law requires prejudgment interest on a negligence claim to be assessed at 10% and, because Section 56-8-4(B) does not contain a specific interest rate for breach of contract judgments, the law requires such interest on a contract claim to be awarded at 15% based on NMSA 1978, Section 56-8-3 (1983).

{110}   We reject Plaintiff's arguments. Dispositive reasons are: (1) we hold in this opinion that the court erred in awarding consequential damages in contract and in awarding punitive damages; and (2) the district court determined that Plaintiff was 80% negligent, entitling Plaintiff at most to only 20% of the total $21 million award. We hold next in this opinion that the court did not err in allowing a set-off against the amount awarded on Plaintiff's negligence claim. For each of the foregoing reasons independent of one another, we see no basis on which to conclude that Defendant's settlement conduct was unreasonable. Furthermore, we are unpersuaded that any equitable grounds exist for an award of prejudgment interest or that any statute requires such an award. We therefore hold that the district court did not abuse its discretion in refusing to award prejudgment interest. To the extent that our holding is based on grounds not considered by the district court, we hold that the court's refusal to award prejudgment interest was right even if for a reason on which we do not rely for our holding. *See Romero v. Prince,* 85 N.M. 474, 476, 513 P.2d 717, 719 (Ct. App. 1973).

## III.   Set-Off

{111}   The district court's amended judgment states that "[Defendant] is entitled to a set-off of the judgment in the amount of $3,212,415.69 . . . based on their subrogation rights purchased from Ohio Casualty Insurance Company, less reasonable attorney[] fees and costs." The background underlying this determination was that Ohio Casualty's subsidiary, West American Insurance Company, Plaintiff's property insurer, paid that amount to

43

Plaintiff in property damage, and on Plaintiff's motion, West American became a party plaintiff in this action based on its subrogation right against Defendant and right to be reimbursed out of an award to Plaintiff. Defendant settled with West American and the insurer released all of its claims and assigned to Defendant its subrogated rights. The release and assignment expressly states that Defendant had "the right to ask the [c]ourt to set off or reduce the award . . . by not more than the amount of West American's recoverable payment to [Plaintiff]."

**{112}** Asserting the collateral source rule and public policy, Plaintiff contends that the district court erred in allowing the set-off against the damages awarded. This issue is one of law, and we review questions of law de novo. *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995); *Kokoricha v. Estate of Keiner*, 2010-NMCA-053, ¶ 11, 148 N.M. 322, 236 P.3d 41.

> The collateral source rule allows a plaintiff to recover his full losses from the responsible defendant, even though he may have recovered part of his losses from a collateral source.
>
> As a general rule, benefits received by the plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce the defendant's liability for damages. This rule holds even though the benefits are payable to the plaintiff because of the defendant's actionable conduct and even though the benefits are measured by the plaintiff's losses.

*McConal Aviation, Inc. v. Commercial Aviation Ins. Co.*, 110 N.M. 697, 700, 799 P.2d 133, 136 (1990) (internal quotation marks and citation omitted).

**{113}** No New Mexico case applies the collateral source rule or public policy to deny a defendant a set-off in the circumstances of the present case. None requires application of the collateral source rule or public policy to preclude the set-off here. Cases outside New Mexico on which Defendant relies have allowed a set-off under circumstances analogous to those in the present case. In *Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 136 P.3d 428, 437-42 (Kan. 2006), the Kansas Supreme Court considered and rejected the application of the collateral source rule to prevent a set-off from a judgment where the defendant-tortfeasors had settled with the plaintiffs' insurers before trial. Much like in New Mexico, the court in *Hayes Sight & Sound* recognized that "[u]nder the collateral source rule, benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." *Id*. at 440 (emphasis omitted) (internal quotation marks and citation omitted). Nevertheless, the court held that the collateral source rule would not bar the set-off because the set-off was based on the rights the defendants acquired from the defendants' settlement of the insurers' subrogation claim and that without the set-off the award to the plaintiffs would overcompensate the plaintiffs when the purpose of tort law was to make the plaintiffs whole. *Id*. at 442. In addition, the court held that the payment "did not diminish the plaintiffs' damages." *Id.*

**{114}** Another closely analogous case is *Yeiser v. Ferrellgas, Inc.*, 214 P.3d 458 (Colo. Ct. App. 2008), *cert. granted*, 2009 WL 2714014 (Aug. 31, 2009) (No. 08SC997) (en banc). The court in *Yeiser* held that the collateral source rule did not preclude a set-off where the plaintiff received payments from her homeowners insurer, the insurer had a subrogation claim that entitled it to be reimbursed out of the plaintiff's recovery against the defendant for the sums the insurer paid to the plaintiff, and the subrogation claim was extinguished by the defendant's payment to the insurer. *Id.* at 460-61.

**{115}** Defendant notes that, although the cases do not address the collateral source rule, other courts have acknowledged that set-offs against judgments are proper when a defendant has settled a subrogation claim with a plaintiff's insurer. *See, e.g.*, *Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937, 942 (Alaska 1983); *Great W. Cas. Co. v. State ex rel. Dep't of Transp. & Dev.*, 960 So. 2d 973, 977 (La. Ct. App. 2007). Similarly, Defendant further notes that, although not squarely addressing the question of the validity of a set-off based on a settled subrogation interest, this Court has nonetheless recognized such set-offs. In *Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 617, 698 P.2d 887, 890 (Ct. App. 1985), a products liability suit was brought after a faulty propane gas tank valve caused an explosion. State Farm, the property insurer, paid approximately $92,000 to the homeowners under their insurance policy. *Id.* at 627, 698 P.2d at 900. State Farm then intervened in the suit and subsequently settled its subrogation claim with one of the defendants for $60,500. *Id.* At trial, the jury awarded the homeowners damages in the amount of $190,000. *Id.* The court then subtracted the subrogation amount from the amount of the judgment before then apportioning the judgment based on the defendants' respective degrees of fault. *Id.* While the central issue regarding the set-off in *Jaramillo* centered upon the district court's math, it is notable that neither the parties nor this Court questioned the permissibility of the set-off in the first instance. *See id.* at 628, 698 P.2d at 901 (citing law and observing that the parties "agree[d] that the settlement of State Farm's subrogation is to be credited [against the judgment]"). While admittedly *Jaramillo* is not in point on the issues, it tends to support the view that the rationale underlying the collateral source rule does not call for its application in the circumstances of this case. This is not a circumstance in which a choice must be made whether to reward a defendant tortfeasor or instead allow an insured plaintiff the additional funds. *See Yeiser*, 214 P.3d at 461 (citing a source that recognized "that availability of subrogation is widely considered the optimal solution for the whole problem of collateral benefits on the ground that it prevents both the defendant from taking an undeserved advantage of the benefit and the plaintiff from being overcompensated" (internal quotation marks and citation omitted)).

**{116}** We see no persuasive rationale for permitting Plaintiff to receive the full amount of the compensatory damages awarded in negligence by the district court with no set-off. The independent transaction between Defendant and West American amounted to Defendant purchasing and the insurer surrendering a right of action against Defendant which, if successful, would essentially permit the insurer to receive from the award to Plaintiff the amount it paid to Plaintiff under the insurance policy. Here, Plaintiff became "a trustee and holds the amount of recovery, equal to the indemnity payment by the insurance company for the use and benefit of the company." *Health Plus of N.M., Inc. v. Harrell*, 1998-NMCA-064, ¶ 6, 125 N.M. 189, 958 P.2d 1239 (alteration omitted) (internal quotation marks and citation

omitted). Plaintiff's recovery was in no way diminished and reimbursement to the insurance company or set-off in favor of Defendant eliminated the overcompensation that would have occurred if reimbursement or set-off were disallowed. The court was not faced with a distasteful choice of benefitting a tortfeasor. Plaintiff was entitled only to the set amount awarded by the court, which in negligence was $21 million reduced by 80%. We agree with Defendant's view that Defendant merely stands in the shoes of the insurer, in effect exercising the insurer's right to receive what it paid to Plaintiff out of the court's award. We do not see the need for the collateral source rule to apply in these circumstances.

**{117}** Nor do we see the process as violating any public policy. Plaintiff agrees that Defendant stood in the insurer's shoes, but argues that the process violates public policy because, "instead of prosecuting [the] subrogation right against the perpetrator of [Plaintiff's] injuries, it is attempting to prosecute that subrogation right against the victim of its own negligence." Plaintiff argues that *State ex rel. Regents of N.M. State Univ. v. Siplast, Inc.*, 117 N.M. 738, 877 P.2d 38 (1994), forbids "an insurer to subrogate against its insured" by insuring an insured against its own negligence yet seeking to recover from the same insured based on its negligence. We reject this argument. *Siplast* stands for nothing further than that an insurer cannot subrogate against its insured. Neither the facts in *Siplast* nor any rationale underlying its holding can be rationally applied to hold the set-off in this case to violate public policy. Plaintiff also argues various other reasons to deny the set-off on public policy grounds, but offers no authority for its arguments and we see no merit in the arguments.

**{118}** We hold that the district court did not err in allowing the set-off. We note that any argument that it would be improper to allow Defendant a set-off for more than it paid the insurer to purchase the subrogation right, although argued by Plaintiff in the district court, was not argued on appeal and this argument was therefore abandoned by Plaintiff. *See State v. Rendleman*, 2003-NMCA-150, ¶ 50, 134 N.M. 744, 82 P.3d 554 (refusing to consider an argument made in the district court but not raised on appeal), *overruled on other grounds by State v. Myers*, 2009-NMSC-016, 146 N.M. 128, 207 P.3d 1105.

**CONCLUSION**

**{119}** On Defendant's appeal, we reverse the district court's award of consequential damages on the contract claim, the award of punitive damages, and the award of future lost profits damages on the negligence claim. If it proves necessary, on the question of recoverable lost future profits on Plaintiff's negligence claim, the district court has jurisdiction to calculate the damages amount as more particularly described earlier in, and consistent with, this opinion. On Plaintiff's cross-appeal, we affirm the district court on all issues.

**{120}  IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

46

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**


_____

**LINDA M. VANZI, Judge**

**Topic Index for** _Sunnyland Farms, Inc. v. Center NM Co-op_**, Docket No. 28,807**

| AE | APPEAL AND ERROR |
|---|---|
| AE-SR | Standard of Review |

| CN | CONTRACTS |
|---|---|
| CN-BR | Breach |
| CN-NP | Negligent Performance |

| RE | REMEDIES |
|---|---|
| RE-AD | Apportionment of Damages |
| RE-CQ | Consequential Damages |
| RE-CO | Credits and Offsets |
| RE-EL | Economic Loss |
| RE-EX | Excessive Damages |
| RE-FD | Future Damages |
| RE-LF | Lost Profits |
| RE-MD | Measure of Damages |
| RE-MI | Mitigation of Damages |
| RE-PJ | Prejudgment Interest |
| RE-PD | Proof of Damages |
| RE-PU | Punitive Damages |
| RE-SD | Special Damages |
| RE-UE | Unjust Enrichment |

| TR | TORTS |
|---|---|
| TR-CT | Contribution Among Tortfeasors |
| TR-FS | Foreseeability |
| TR-NG | Negligence |